**In re Reapportionment of the COLORADO GENERAL ASSEMBLY.**

No. 11SA282.

Supreme Court of Colorado, En Banc.

Nov. 15, 2011.

McKenna Long & Aldridge LLP, David R. Fine, Richard C. Kaufman, Jennette C. Roberts, Joseph G. Martinez, Colorado Reapportionment Commission, Jeremiah B. Barry, Kate Meyer, Troy C. Bratton, Denver, Colorado, Attorneys for Proponent Colorado Reapportionment Commission.

Olivia Mendoza, pro se, Denver, Colorado, Representing Proponent Colorado Latino Forum.

Brownstein Hyatt Farber Schreck, LLP, Jason R. Dunn, Michael D. Hoke, Denver, Colorado, Attorneys for Opposer Colorado Citizens for Fair Representation.

Hayes, Phillips, Hoffmann & Carberry, P.C., Kendra L. Carberry, Christine C. Stretesky, Denver, Colorado, Attorneys for Opposers Town of Superior, Colorado, Andrew Muckle, Elia Gourgouris, Joe Cirelli, Chris Hanson, Sandy Pennington, Lisa Skumatz, and Debra Williams.

Ellen G. Wakeman, Jefferson County Attorney, Writer Mott, Assistant County Attorney, Golden, Colorado, Attorneys for Opposer Jefferson County Board of County Commissioners.

Robert A. McGuire, Attorney at Law, LLC, Robert A. McGuire, Denver, Colorado, Attorneys for Opposers Douglas County Board of County Commissioners, Elbert County Board of Commissioners, El Paso County Clerk & Recorder Wayne Williams, El Paso County Treasurer Bob Balink, El Paso County Commissioner Sallie Clark, Yuma County Commissioner Trent Bushner, Bill Jerke, Al Kolwicz, Marty Neilson, Dick R. Murphy, Valarie Murphy, and Jim Paine.

Bruce T. Barker, Weld County Attorney, Greeley, Colorado, Attorney for Opposer Board of County Commissioners of Weld County, Colorado.

Andrew Gorgey, Garfield County Attorney, Glenwood Springs, Colorado, Attorney for Opposer Board of County Commissioners of Garfield County, Colorado.

Newnam Land, LLP, Mary D. Newnam, Robert G. Land, Trinidad, Colorado, Attorneys for Opposer Las Animas County Board of County Commissioners.

Abadie & Schill, PC, William E. Zimsky, Durango, Colorado, Attorneys for Opposers Southwest Colorado Citizens for a Constitutional Map and Club 20.

Kathryn L. Schroeder, Arapahoe County Attorney, John E. Bush, Jr., Deputy County Attorney, Littleton, Colorado, Attorneys for Opposer Board of County Commissioners of the County of Arapahoe, State of Colorado.

Carol Tullis, pro se, Cortez, Colorado, Representing Opposer Montezuma County Clerk and Recorder.

PER CURIAM.

In this original proceeding, we are required to review the finalized Reapportionment Plan ("Adopted Plan") submitted by the Colorado Reapportionment Commission ("Commission") to determine whether the Adopted Plan complies with article V, sections 46 and 47 of the Colorado Constitution. Colo. Const. art. V, § 48(1)(e). We hold that the Adopted Plan is not sufficiently attentive to county boundaries to meet the requirements of article V, section 47(2), and the Commission has not made an adequate showing that a less drastic alternative could not have satisfied the hierarchy of constitutional criteria set forth in our most recent reapportionment opinion, *In re Reapportionment of the Colo. Gen. Assembly*, 45 P.3d 1237 (Colo. 2002) [hereinafter *In re Reapportionment 2002* ]. We therefore return the Adopted Plan to the Commission for further consideration, modification, and resubmission by 5:00 p.m. on December 6, 2011.

I.

Pursuant to Colorado Constitution article V, section 48(1)(a), the Commission was tasked with redrawing Colorado House and Senate districts based on population changes reflected in the 2010 federal census. We commend the Commission and its staff for their effort and commitment to a difficult and complex endeavor. The Commission held eleven meetings between May and July 2011 to receive public testimony from various geographic regions of the state; it then conducted twenty-five public hearings throughout the state to receive comments on its preliminary plans. In addition, the Commission maintained a website with information about the reapportionment process, the Commission's hearings, and copies of proposed plans, and regularly sent updated information to more than 330 interested persons on an e-mail mailing list.

At a subsequent meeting on September 12, 2011, the Commission reviewed and discussed proposed final plans (Final Plans Senate 001v1 and 002v1, and Final Plans House 001v1 and 002v1). After that meeting, the Chair of the Commission submitted additional proposed final plans (Final Plan Senate 003v1 and Final Plan House 003v1), and on September 19, 2011, the eleven-member Commission voted to approve the Chair's proposed plans for the Senate (9–2) and House (8–3). Together, these approved plans became the Adopted Plan now before us. Only a limited number of the sixty-five

House districts [1] and an even smaller number of the thirty-five Senate districts [2] are challenged here; no objections have been raised to the remaining districts in the Adopted Plan.

## II.

Our role in this proceeding is a narrow one: we measure the Adopted Plan against the constitutional standards, according to the hierarchy of federal and state criteria we have previously identified. *In re Reapportionment 2002* at 1247; *In re Reapportionment of the Colo. Gen. Assembly*, 828 P.2d 185, 189–90 (Colo.1992) [hereinafter *In re Reapportionment 1992* ]; *In re Reapportionment of the Colo. Gen. Assembly*, 647 P.2d 191, 194 (Colo.1982) (per curiam) [hereinafter *In re Reapportionment 1982* ]. Our review must be swift and limited in scope so that elections may proceed on schedule. *In re Reapportionment 1992*, 828 P.2d at 189; *In re Reapportionment 1982*, 647 P.2d at 194 n. 6.

In redrawing legislative districts for the House and Senate of the Colorado General Assembly, the Commission must comply with federal law and state constitutional standards, the overarching purpose of which is to assure equal protection of the right to vote and the right to participate in the political process. *In re Reapportionment 1982*, 647 P.2d at 194.

Our prior opinions addressing reapportionment have established a clear hierarchy of the relevant federal and state criteria. In order of priority, the Adopted Plan must comply with:

(1) The Fourteenth Amendment Equal Protection Clause, U.S. Const. amend. XIV, § 1 (prohibiting the states from denying "to any person within its jurisdiction the equal protection of the laws"); and the Fifteenth Amendment, *id.* amend. XV ("The right of citizens of the United states to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude.");

(2) Section 2 of the Voting Rights Act of 1965, Pub.L. 89–110, 79 Stat. 445 (codified as amended in 42 U.S.C. § 1973) (prohibiting a state or political subdivision from imposing or applying a "voting qualification or prerequisite to voting or standard, practice, or procedure … in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title [pertaining to a member of a language minority group] );

(3) Colorado Constitution article V, section 46 (requiring substantial equality of population of districts, not to exceed five percent deviation between the most populous and least populous district in each house);

(4) Colorado Constitution article V, section 47(2) (prohibiting districts that divide counties, "[e]xcept when necessary to meet the equal population requirements of section 46," and requiring that "the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible");

(5) Colorado Constitution article V, section 47(1) (requiring districts to be as compact as possible and consist of contiguous whole general election precincts); and

(6) Colorado Constitution article V, section 47(3) (requiring preservation of communities of interest within a district wherever possible).

*In re Reapportionment 2002*, 45 P.3d at 1247; *In re Reapportionment 1992*, 828 P.2d at 189–90.

In explaining this hierarchy, we have previously acknowledged that any plan adopted by the Commission must first comply with federal law. *In re Reapportionment 2002*, 45

---

**1.** Objections have been raised to House districts 1, 14–21, 25, 38, 56, 47, 58, 59, and 63–65 of the Adopted Plan.

**2.** Objections have been raised to Senate districts 9–12, 16, 26, 31, and 32 of the Adopted Plan.

P.3d at 1247 ("If the Commission faces actual or probable federal law violations, its starting point for the Approved Plan is compliance with federal law."); *see also In re Reapportionment 1992*, 828 P.2d at 189–93 (discussing Voting Rights Act objections raised to the 1992 reapportionment plan). "If federal law issues are not present, the Commission proceeds directly to the Colorado criteria and applies them according to their preferential order." *In re Reapportionment 2002*, 45 P.3d at 1247.

■ With respect to the state constitutional criteria, our prior case law has made clear that section 47(2) allows the Commission to divide a county only if necessary to meet the equal population requirement of section 46. *Id.* at 1248 (citing *In re Reapportionment 1982*, 647 P.2d at 197). The five percent deviation[3] allowance in section 46 provides the Commission some flexibility in maintaining substantially equal population across all districts in a house (the paramount concern under the Fourteenth Amendment and section 46), while simultaneously minimizing county and city splits (the most important criterion under section 47). *In re Reapportionment 2002*, 45 P.3d at 1248. We have emphasized that "[t]he Commission's Adopted Plan must be (1) sufficiently attentive to county boundaries to meet the requirement of section 47(2), and (2) accompanied by an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution." *Id.* at 1249 (internal quotations and citations omitted).

The remaining criteria, compactness and preservation of communities of interest, are subordinate to compliance with section 47(2). Other nonconstitutional considerations, such as the competitiveness of a district, are not per se illegal or improper; however, such factors may be considered only after all constitutional criteria have been met.

### III.

■ The various objections to the Adopted Plan revolve around a common theme: namely, that the Adopted Plan violates section 47(2) because it is not sufficiently attentive to county boundaries, and because it failed to minimize city splits in Colorado Springs.[4] We agree.

For example, the Commission contends that it was required to comply with section 2 of the Voting Rights Act when drawing districts in Aurora, and that such compliance justified county splits in Arapahoe and Jefferson counties, directly and indirectly affecting several House districts. The changed ethnic and cultural demographics in this area of the state are unquestionably valid "community of interest" concerns under section 47(3), and the Commission appropriately considered these demographics, particularly the growth in the Latino population across the state, as part of its overall approach to drawing districts. However, the Commission's reliance on the need to comply with the Voting Rights Act to justify dividing Arapahoe and Jefferson counties cannot trump section 47(2) on the record before us, where the Commission conceded in its briefing and at oral argument that it lacked information from which its expert could opine on any potential section 2 violation in Aurora.[5] *See generally*

---

3. "The five percent deviation test means that the sum of the percent by which the largest district's population exceeds that of the ideal district and the percent by which the smallest district population falls short of the population of the ideal district must be *less than* five percent." *In re Reapportionment 1982*, 647 P.2d at 193 n. 4 (emphasis added); *see also In re Reapportionment 2002*, 45 P.3d at 1253 (noting technical violation of section 46 where deviation was 5.001 percent); *In re Reapportionment of the Colo. Gen. Assembly*, 46 P.3d 1083, 1090 (Colo.2002) (noting remedy of the technical violation).

4. Objections to the House plan on this ground were filed by Arapahoe County; Douglas County;

various officials and citizens of Elbert, El Paso, and Yuma counties; Jefferson County; Las Animas County; Weld County; Town of Superior; Southwest Colorado Citizens for a Constitutional Map and Club 20; and Colorado Citizens for Fair Representation (CCFR). Objections to the Senate plan on this ground were filed by Arapahoe County; Douglas County; Town of Superior; and CCFR. The Garfield County Board of County Commissioners and the Montezuma County Clerk and Recorder both objected to the manner in which their respective counties were divided.

5. Thus, unlike in 1992, when the Commission was presented with a genuine dispute regarding potential Voting Rights Act violations, *see In re*

*Bartlett v. Strickland,* 556 U.S. 1, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009). Consequently, this justification for county splits in Arapahoe and Jefferson Counties is inadequate. This is particularly true where the record indicates that the Commission had before it alternative plans that avoided the county boundary splits challenged here while still preserving these communities of interest through Hispanic-majority and minority-influence districts.

Absent a showing that federal law requires a different result, section 47(2) " 'allows the Commission to divide a county *only if necessary* to meet the equal population requirement.' " *In re Reapportionment 2002,* 45 P.3d at 1248 (quoting *In re Reapportionment 1982,* 647 P.2d at 197). We hold that the Adopted Plan is not sufficiently attentive to county boundaries to meet the requirements of article V, section 47(2). We further hold that the Commission has not made an adequate showing that a less drastic alternative could not have satisfied the equal population requirement of article V, section 46, given that the record before us reflects that the Commission was presented with alternative plans that avoided many of the boundary splits challenged here. Accordingly, as required by article V, section 48(1)(e) of the Colorado Constitution, we return the Adopted Plan to the Commission for further consideration, modification, and resubmission with supporting materials by 5:00 p.m. on December 6, 2011.

■ We again commend the Commission for its extraordinary efforts, and we recognize that redrawing districts to minimize county and city splits may well require adjustments to other district boundaries. We do not redraw the apportionment map for the Commission. Rather, " '[t]he choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court.' " *In re Reapportionment 1992,* 828 P.2d at 189 (quoting *In re Reapportionment 1982,* 647 P.2d at 194). The Commission shall determine how to formulate a plan that complies with article V,

sections 46 and 47, in accordance with the guidance offered on remand in our 2002 opinion. *See In re Reapportionment 2002,* 45 P.3d at 1254.

Chief Justice BENDER dissents, and Justice RICE joins in the dissent.

Chief Justice BENDER, dissenting.

The per curiam majority rejects the Adopted Plan on grounds that the Adopted Plan is not sufficiently attentive to county boundaries under article V, section 47(2) of the Colorado Constitution. In light of the deference we are compelled to give the Commission, I believe the Adopted Plan is sufficiently attentive to county boundaries and substantially complies with both federal and state constitutional standards. The per curiam majority's application of article V, section 47(2) goes beyond the narrow scope of review to which we are confined. By votes of 9–2 for the Senate plan and 8–3 for the House plan, the Commission approved the Adopted Plan. This Plan is consistent with the aim of our reapportionment process to prevent gerrymandering and to promote political fairness among the state's legislative districts. The per curiam majority's rejection of the Adopted Plan eliminates the very discretion necessary for the Commission to do its job under the federal and Colorado constitutional mandates. Hence, I respectfully dissent and would approve the Adopted Plan.

The reapportionment process is not meant to be so rigid as to preclude the Commission from exercising its constitutionally mandated discretion. Accordingly, there is a "strong presumption of validity" given to the Adopted Plan so long as: (1) the plan was developed by neutral decision-makers on the basis of neutral criteria; (2) there was adequate opportunity for the presentation and consideration of differing points of view; and (3) the guidelines used in selecting the plan were explained. *In re Reapportionment 1992,* 828 P.2d 185, 189 n. 4 (Colo.1992).

*Reapportionment 1992,* 828 P.2d at 189–93, here, the Commission had before it no evidence indi-

cating racial bloc voting in this area.

We recognize "the difficulty the Commission faces in complying simultaneously with multiple constitutional criteria which may conflict in application." *In re Reapportionment 1982*, 647 P.2d 191, 194 (Colo.1982). "[P]erfection is not obtainable." *In re Reapportionment 2002*, 45 P.3d 1237, 1249 (Colo. 2002). As Justice Souter put it: "The choice to draw a district line one way, not another always carries some consequence for politics, save in a mythical State with voters of every political identity distributed in an absolutely gray uniformity." *Vieth v. Jubelirer*, 541 U.S. 267, 343, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Souter, J., dissenting).

Our role is to determine "whether the Commission followed the procedures and applied the criteria of federal and Colorado law in adopting its reapportionment plan." *In re Reapportionment 2002*, 45 P.3d at 1247. "Although we might make different choices were we in the Commission's place, we should not substitute our judgment for the Commission's unless we are convinced the Commission departed from the constitutional criteria." *In re Reapportionment 1982*, 647 P.2d at 197. Our reapportionment plans have been approved despite challenges based on non-compact districts, county splits, and divergent communities of interest.[1]

By its nature, reapportionment is an inherently political endeavor. The purpose of the reapportionment process, as approved in 1974, is to promote political fairness and to reduce the gerrymandering of legislative districts.[2] "By definition, gerrymandering involves drawing [legislative] district boundaries ... in order to maximize the voting strength of those loyal to the dominant politi-cal faction and to minimize the strength of those opposed to it." *City of Mobile v. Bolden*, 446 U.S. 55, 87, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (Stevens, J., concurring).[3]

Colorado's constitutional regime sets forth a system designed to reduce the impact of gerrymandering and to promote political fairness. It seeks to change what is inherently partisan about the reapportionment process. In part, this is achieved by requiring the Commission to have diverse geographic representation, diverse political affiliation, and appointments by all three branches of government.[4]

In my view, a nonpartisan Commission is more likely to draw competitive political districts which would promote political fairness and would counterbalance any gerrymandering efforts. Hence, competitive legislative districts are the antithesis of gerrymandered ones. The creation of competitive legislative districts is an appropriate discretionary consideration for the Commission. The Commission's report reflects testimony that competitiveness was significant to both the public and to the Commission's decisions.

Just as the Commission's efforts to establish competitive districts should be afforded deference by the Court, so should deference be given by the Court to the Commission's efforts to ensure equal and fair representation for all racial and ethnic groups. It has long been the objective of Colorado's voter-backed reapportionment process to ensure that "minority groups living in concentrated population areas should be better able to obtain representation in the General Assem-

**1.** *See In re Reapportionment of Colo. Gen. Assembly*, 46 P.3d 1083 (Colo.2002); *In re Reapportionment of Colo. Gen. Assembly*, 828 P.2d 213 (Colo. 1992); *In re Reapportionment of Colo. Gen. Assembly*, 647 P.2d 209 (Colo.1982).

**2.** *See* Concerning Amendment No. 9, Legislative Council of the Colo. Gen. Assembly, An Analysis of 1974 Ballot Proposals, Research Pub. No. 206 (1974) at 29–30.

**3.** *Superseded by statute on other grounds as stated in Thornburg v. Gingles*, 478 U.S. 30, 43–44, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

**4.** The Commission consists of the Speaker and Minority Leader of the state House, the Majority and Minority Leaders of the state Senate, three appointees of the Governor, and four appointees of the Chief Justice of the Colorado Supreme Court. Concerning Amendment No. 9, Legislative Council of the Colo. Gen. Assembly, An Analysis of 1974 Ballot Proposals, Research Pub. No. 206 (1974) at 26. In addition, no more than six of the Commission's eleven members can be affiliated with the same political party, and each federal Congressional district of the state must be represented on the Commission with at least one member residing west of the Continental Divide. *Id.* at 27.

bly commensurate with their population." [5] As a result, one of the Commission's primary functions is to ensure that any reapportionment plan does not result in the underrepresentation of minorities in violation of section 2 of the Voting Rights Act ("section 2"). *In re Reapportionment 1992*, 828 P.2d at 189–90; *see* 42 U.S.C. § 1973 (2011). In accordance with the Supremacy Clause, U.S. Const. art. VI, cl. 2, the Commission must address section 2 concerns before attending to Colorado constitutional concerns, such as county splitting. *See In re Reapportionment 1992*, 828 P.2d at 190.

Section 2 prevents a state or political subdivision from imposing any voting qualification, prerequisite, standard, practice, or procedure which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," or on account of a citizen's membership in a "language minority group." *42 U.S.C.* §§ 1973(a), 1973b(f)(2) (2011). A state body violates section 2 if:

> [B]ased on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class of citizens] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* at § 1973(b).

Section 2 also states that the "extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" in determining whether a violation of the statute has occurred. *Id.* A section 2 violation may also be proved by showing discriminatory effect alone; the contested electoral mechanism need not have been intentionally adopted or maintained for a discriminatory purpose. *Gingles*, 478 U.S. at 35, 106 S.Ct. 2752.

The United States Supreme Court has identified a number of circumstances that might indicate a section 2 violation. *Id.* at 36–37, 106 S.Ct. 2752. These circumstances include, among others: (1) the extent to which voting in elections of the State or political subdivision is racially polarized; (2) the extent to which members of a minority group bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; and (3) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. *Id.* at 37, 106 S.Ct. 2752.

The Commission is assigned the difficult task of anticipating section 2 violations that could occur as a result of its redistricting plan. It thus must make a good faith effort to apply the legal standards of section 2 to the presently available evidence with the goal of creating a plan that will not violate section 2 in the future. In our 1992 reapportionment decision, we held that:

> [I]f facts material to the resolution of a section 2 claim are in genuine dispute, if it appears from the record that the Commission has made a *good faith effort* to resolve these disputed facts, and if the Commission has applied the correct legal standard to the facts it has found, we will not reject the Final Plan on Voting Rights Act grounds.

*In re Reapportionment 1992*, 828 P.2d at 192 (emphasis added). Therefore, if we find that the Commission made a good faith effort to apply section 2 legal standards to the available evidence, and in doing so found that it needed to draw specific districts in a particular manner to avoid future section 2 violations, we should defer to the Commission's judgment that the Voting Rights Act justifies certain portions of the Adopted Plan.

The per curiam majority does not adequately consider the section 2 concerns that the Commission analyzed and relied upon in

---

5. Concerning Amendment No. 4, Legislative Council of the Colo. Gen. Assembly, An Analysis of 1966 Ballot Proposals, Research Pub. No. 110 (1966) at 18; *see also In re Reapportionment 2002*, 45 P.3d at 1245 (noting that "[t]he 1974 constitutional amendments built on prior Colorado reapportionment law, most particularly on the 1966 citizen-initiated constitutional amendments").

devising and accepting the Adopted Plan. It therefore improperly downplays a federal concern that supersedes Colorado's constitutional requirements. The issue of minority voting rights was discussed at eight of the Commission's public hearings. All Commission members agreed that minority voting rights were an important consideration to drawing districts. The Commission was briefed on the legal requirements of the Voting Rights Act during its first meeting. It was therefore aware of the section 2 legal standards throughout the planning process.

With respect to Aurora, the Commission found that the Hispanic population grew by 38,499 people, or 70.3 percent, between 2000 and 2010, which accounts for 79 percent of the total growth of the city over the past decade. When the African–American population is taken into account, the city of Aurora has a total minority population of 73.3 percent. Despite the fact that Aurora is now a majority-minority city, it has never had a Hispanic state senator or representative. Of the city's present twelve-member delegation in the General Assembly, there is only one minority member.

In addition, the Commission conducted an executive session with its outside counsel specifically related to racial bloc voting. It also heard testimony from the public regarding the growth of heavily Hispanic neighborhoods, as well as the educational and employment challenges facing those communities. The Commission considered this evidence of the totality of the circumstances and determined that there were section 2 concerns in Aurora which needed to be addressed. It took these concerns into account in the Adopted Plan.

The per curiam majority, however, rejects the Commission's concern for a potential section 2 violation in Aurora solely on the ground that the Commission failed to obtain expert testimony on the existence of racial bloc voting in Aurora. While the per curiam majority is correct that the record is devoid of any such expert testimony, this fact does not address the question of whether a potential voting imbalance has occurred, or might eventually occur, in Aurora. The Commission's expert could not opine on this matter because there has been no recent election in Aurora between an Anglo candidate and a Hispanic candidate for her to analyze. Therefore, the record is also devoid of any evidence that racial bloc voting *does not* occur in Aurora. I do not believe that the serendipitous history of recent elections in Aurora should control the present case and nullify the Commission's appropriate respect for the fundamental rights that are protected by the Voting Rights Act, especially in light of the fact that the Commission made a good faith effort to consider other evidence related to potential section 2 problems in the Aurora area and used that evidence when it devised the Adopted Plan.

Because the Commission made a good faith effort to apply the evidence of a potential section 2 violation in Aurora in light of the appropriate legal standards, I believe the Commission has substantially complied with federal and state constitutional standards and the few county splits contained in the Adopted Plan are constitutionally justified.

I am authorized to state that JUSTICE RICE joins in this dissent.