*222 O’Donnell, J.
{¶ 1} The Ohio Constitution provides for an apportionment board consisting of the “governor, auditor of state, secretary of state, one person chosen by the speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member, and one person chosen by the legislative leaders in the two houses of the major political party of which the speaker is not a member.” Ohio Constitution, Article XI, Section 1. It further charges the board with the responsibility to draw the district boundaries, id., and vests the Ohio Supreme Court with “exclusive, original jurisdiction in all cases arising under this Article,” id. at Section 13. Apportionment is “primarily a political and legislative process,” Gaffney v. Cummings, 412 U.S. 735, 749, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), and as a result, both courts and scholars have universally agreed that politics cannot be divorced from the process.
{¶ 2} The issue we confront in this original action challenging the decennial apportionment of districts in the General Assembly is whether the plan adopted by the apportionment board complies with the Ohio Constitution, Article XI, Sections 7 and 11. Because relators failed to rebut the presumed constitutionality accorded the 2011 apportionment plan by establishing that the plan is unconstitutional beyond a reasonable doubt, we deny their request for declaratory and injunctive relief.
*223 Facts
{¶ 3} The 2011 Ohio Apportionment Board consisted of respondents, Governor John Kasich, Auditor David Yost, Secretary of State Jon Husted, and Senate President Thomas Niehuas, who are members of the Republican Party, and House Minority Leader Armond Budish, a member of the Democratic Party. The board has the constitutional authority to apportion the districts for members of the General Assembly. Ohio Constitution, Article XI, Section 1.
{¶ 4} The board’s joint secretaries prepared an apportionment plan and submitted it to the board. On September 28, 2011, the board voted four to one to approve an amended version of that plan, with the four Republican members of the board voting in favor and the lone Democratic member voting in opposition. On September 30, 2011, the board adopted another amendment to the secretaries’ plan and approved the final plan with a four-to-zero vote, with respondents all voting in favor of the plan and the sole Democratic board member unable to attend the meeting.
{¶ 5} On January 4, 2012, relators, 36 electors living in various house districts as reapportioned by the Ohio Apportionment Board, filed this action under Article XI against respondents, four members of the apportionment board, but did not designate Armond Budish, the House Minority Leader, as a party. They primarily sought a declaration that the decennial apportionment plan adopted by respondents is invalid under Article XI and the Open Meetings Act and a prohibitory injunction preventing respondents from conducting elections using the state legislative districts set forth in the plan.
{¶ 6} Following the submission of responses, evidence, and briefs pursuant to a court-ordered accelerated schedule, on February 17, 2012, we dismissed relators’ open-meetings claim for lack of subject-matter jurisdiction and denied relators’ Article XI claims based on laches insofar as they attempted to challenge the use of the apportionment plan for the 2012 election cycle. Wilson v. Kasich, 131 Ohio St.3d 249, 2012-Ohio-612, 963 N.E.2d 1282, ¶ 8 (O’Donnell, J., dissenting in part) (urging that the court has an obligation to review apportionment matters expeditiously and asserting that a piecemeal resolution permitting electors to vote when the underlying apportionment is under constitutional attack is ill-advised precedent). Relators’ remaining Article XI claims are still pending. Id.
{¶ 7} On March 2, 2012, we ordered the parties to file supplemental briefs addressing the following questions and invited them to address any other issues they deemed necessary:
*224 1. Does the Supreme Court of Ohio have jurisdiction over this case when only four of the five members of the apportionment board have been named as respondents and the board has not been named as a party?
2. Does the Ohio Constitution mandate political neutrality in the reapportionment of house and senate districts?
3. What is relators’ burden in showing that a reapportionment plan is unconstitutional?
4. Does tension exist among sections 3, 7, and 10 of Article XI of the Ohio Constitution, and if so, how are these sections to be harmonized?
The parties are further permitted to address any other issues they deem necessary to this court’s review in the supplemental briefs.
131 Ohio St.3d 1468, 2012-Ohio-848, 962 N.E.2d 800.
{¶ 8} After the parties filed their supplemental briefs, we denied relators’ motion for leave to file an amended complaint to add Budish as a relator, 131 Ohio St.3d 1519, 2012-Ohio-1783, 965 N.E.2d 1002, and held oral argument.
{¶ 9} This cause is now before the court for its consideration of relators’ remaining claims.
Legal Analysis

Jurisdiction

{¶ 10} As the parties now agree, neither the apportionment board nor board member Budish is a necessary and indispensable party to this action under Civ.R. 19. We do note, however, that it remains better practice in this type of action to name the board and all its members as parties. The Ohio Constitution, Article XI, Section 13 specifies that this court “shall have exclusive, original jurisdiction in all cases arising under this Article” and further notes that if any apportionment plan “made by the persons responsible for apportionment, by a majority of their number” is determined to be invalid by either this court or the United States Supreme Court, “the persons responsible for apportionment by a majority of their number” shall determine a new, constitutionally compliant plan; see also Voinovich v. Ferguson, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992) (court resolved declaratory-judgment action involving the constitutionality of an apportionment plan in which the apportionment board was not one of the named parties), and State ex rel. Lehman v. DiSalle, 173 Ohio St. 361, 182 N.E.2d 564 (1962) (court resolved mandamus action challenging state-senate apportionment plan although board was not named a party).
{¶ 11} Thus, the merits of relators’ remaining claims are properly before us.

*225
Political Neutrality

{¶ 12} Pursuant to the Ohio Constitution, Article XI, Section 1, the five-member apportionment board is responsible for the apportionment of the state for members of the General Assembly. The board must establish the boundaries for each of the 99 house districts and 33 senate districts every ten years. The method of apportionment of the state for members of the General Assembly is determined by using a ratio of representation, which is calculated by dividing the whole population of the state, as determined by the federal decennial census, by 99 for the house and by 33 for the senate. Ohio Constitution, Article XI, Section 2. The population of each house and senate district must be substantially equal to the applicable ratio of representation, and in no event shall any district contain a population of less than 95 percent or more than 105 percent of the pertinent ratio. Ohio Constitution, Article XI, Sections 3 and 4. Each house district is entitled to a single representative, and each senate district is entitled to a single senator. Ohio Constitution, Article XI, Section 5.
{¶ 13} In assessing relators’ Article XI claims, we must initially determine whether these provisions mandate political neutrality in the reapportionment process. “ ‘Generally speaking, in construing the Constitution, we apply the same rules of construction that we apply in construing statutes.’ ” Smith v. Leis, 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 57, quoting State v. Jackson, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14. The court’s paramount concern in statutory construction is the legislative intent in the statute’s enactment, and to discern this intent, we read words and phrases in context according to the rules of grammar and common usage. State ex rel. Mager v. State Teachers Retirement Sys. of Ohio, 123 Ohio St.3d 195, 2009-Ohio-4908, 915 N.E.2d 320, ¶ 14. Consequently, our priniary concern in construing Article XI is to determine the intent of the electorate in adopting the article, and to discern that intent, we must examine its text.
{¶ 14} The words used in Article XI do not explicitly require political neutrality, or for that matter, politically competitive districts or representational fairness, in the apportionment board’s creation of state legislative districts. Unlike Ohio, some states specify in either constitutional or statutory language that no apportionment plan shall be drawn with the intent of favoring or disfavoring a political party. See In re Senate Joint Resolution of Legislative Apportionment 1176, 83 So.3d 597, 615 (Fla.2012) fn. 19, and the state constitutions and statutes cited therein. Therefore, Article XI does not prevent the board from considering partisan factors in its apportionment decision.
{¶ 15} Nevertheless, as relators emphasize in their supplemental brief, and as respondents acknowledge in their supplemental response brief, political considerations cannot override the requirements of Article XI. Other states have reached *226 this same conclusion regarding redistricting in their states. See Holt v. 2011 Legislative Reapportionment Comm., 38 A.3d 711, 745 (Pa.2012) (“It is true, of course, that redistricting has an inevitably legislative, and therefore an inevitably political, element; but, the constitutional commands and restrictions on the process exist precisely as a brake on the most overt of potential excesses and abuse”); In re Reapportionment of the Colorado Gen. Assembly, — P.3d-, -, 2011 WL 5830123, *3 (Colo.2011) (“Other nonconstitutional considerations, such as the competitiveness of a district, are not per se illegal or improper; however, such factors may be considered only after all constitutional criteria have been met”); In re Legislative Districting of the State, 370 Md. 312, 370, 805 A.2d 292 (2002) (“The constitution ‘trumps’ political considerations. Politics or non-constitutional considerations never ‘trump’ constitutional requirements”).
{¶ 16} Therefore, the Ohio Constitution does not mandate political neutrality in the reapportionment of house and senate districts, but partisan considerations cannot prevail over the requirements set forth in Article XI. As long as the 2011 apportionment plan satisfied the constitutional requirements set forth in Article XI, respondents were not precluded from considering political factors in drafting it. See Davis v. Bandemer, 478 U.S. 109, 128, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion), quoting Gaffney v. Cummings, 412 U.S. 735, 752-753, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (“ ‘Politics and political considerations are inseparable from districting and apportionment’ ”). And, here, political factors were considered only after the applicable constitutional and other legal requirements were met.

Presumption of Constitutionality and Burden of Proof

{¶ 17} In assessing the merits of relators’ claims, we defer to the apportionment board’s reasonable construction of the principles expressed in Article XI. Voinovich v. Ferguson, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992).
“Hence, it is not sufficient in this proceeding that we might be of the opinion that we could make a better apportionment than has been made by the board: To authorize this court to interfere and command the board to make another apportionment, the apportionment made must so far violate the rules prescribed by the constitution, as to enable us to say, that what has been done is no apportionment at all, and should be wholly disregarded. If by any fair construction of the principles prescribed by the constitution for making an apportionment, the one made may be sustained, then it cannot be disregarded and a new one ordered.
“ * =1= * The very £ac|. thg governor, auditor and secretary of state are consociated as a board to apportion the state for members of the *227 general assembly, shows of itself, that, in the judgment of the framers of the constitution, in applying the rules prescribed, a discretion would have to be exercised, and those officers were selected to exercise it. Whether the discretion conferred on the board, has been wisely or unwisely exercised in this instance, is immaterial in this proceeding. It is sufficient that they had the power under the constitution to make the apportionment as they have made it. For the wisdom, or unwisdom, of what they have done, within the limits of the powers conferred, they are answerable to the electors of the state, and no one else.”
Id. at 204 (Holmes, J., concurring), quoting State ex rel. Gallagher v. Campbell, 48 Ohio St. 435, 436-437 and 442, 27 N.E. 884 (1891).
{¶ 18} In resolving claims contesting the constitutionality of a statute, we presume the constitutionality of the legislation, and the party challenging the validity of the statute bears the burden of establishing beyond a reasonable doubt that the statute is unconstitutional. See State ex rel. Zeigler v. Zumbar, 129 Ohio St.3d 240, 2011-Ohio-2939, 951 N.E.2d 405, ¶ 24; Ohio Grocers Assn. v. Levin, 123 Ohio St.3d 303, 2009-Ohio-4872, 916 N.E.2d 446, ¶ 11.
{¶ 19} Although a board’s apportionment plan is not a statute, the same general principle applies in resolving relators’ attack on the constitutionality of the apportionment plan as that which is applied to attacks on the constitutionality of statutes for the following reasons:
{¶ 20} First, Article XI was enacted to permit the apportionment board to perform the duty previously conferred on the General Assembly to apportion seats in the General Assembly. In effect, the apportionment board is performing what was previously a legislative function. See Ely v. Klahr, 403 U.S. 108, 114, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971) (“districting and apportionment are legislative tasks in the first instance”); Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Comm., 220 Ariz. 587, 208 P.3d 676 (2009) ¶ 19 (“Not only do enactments that carry the force of law traditionally originate in the legislature, but the process of redistricting is itself traditionally viewed as a legislative task”).
{¶ 21} Second, as with legislation, a presumption of validity attaches to the apportionment board’s adopted apportionment plan. See Gallagher, 48 Ohio St. at 437, 27 N.E. 884 (apportionment board is vested with discretion to adopt decennial apportionment plan, and “[i]f by any fair construction of the principles prescribed by the constitution for making an apportionment, the one made may be sustained, then it cannot be disregarded and a new one ordered”). “ ‘[I]n the absence of evidence to the contrary, public officers, administrative officers and public authorities, within the limits of the jurisdiction conferred upon them by *228 law, will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully.’ ” State ex rel. Skaggs v. Brunner, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, ¶ 51, quoting State ex rel. Speeth v. Carney, 163 Ohio St. 159, 186, 126 N.E.2d 449 (1955).
{¶ 22} Third, because the people of Ohio placed apportionment authority in the hands of the board, the apportionment plan should be accorded the same, if not greater, consideration as a statute enacted by the General Assembly. It is logical, therefore, to require relators to rebut the plan’s presumed constitutionality by proving beyond a reasonable doubt that the apportionment plan is unconstitutional.
{¶ 23} Finally, this standard comports with the standard applied by other state supreme courts in resolving constitutional challenges to a reapportionment plan. See Parella v. Montalbano, 899 A.2d 1226, 1232-1233 (R.I.2006) (challengers to state legislative redistricting statute had the burden of proving that the statute was unconstitutional beyond a reasonable doubt); Logan v. O’Neill, 187 Conn. 721, 729-730, 448 A.2d 1306 (1982) (applying the same burden of proof to a reapportionment plan even though it was not a statute — “Although, here, the legislative action being challenged is not a statute because it is not subject to the approval of the governor, it is entitled to at least the same judicial respect as a statute”); McClure v. Secy, of the Commonwealth, 436 Mass. 614, 622, 766 N.E.2d 847 (2002) (plaintiffs challenging constitutionality of legislative redistricting plan could not prevail in the case unless they established beyond a reasonable doubt that it is impossible by any reasonable construction to interpret the redistricting statute in harmony with the state constitution); In re Wolpoff 80 N.Y.2d 70, 78, 587 N.Y.S.2d 560, 600 N.E.2d 191 (1992) (“A strong presumption of constitutionality attaches to the redistricting plan and we will upset the balance struck by the Legislature and declare the plan unconstitutional” only when it is shown to be unconstitutional beyond a reasonable doubt).
{¶ 24} Consequently, the burden of proof on one challenging the constitutionality of an apportionment plan is to establish that the plan is unconstitutional beyond a reasonable doubt. In the absence of evidence to the contrary, we presume that the apportionment board properly performed its duties in a lawful manner. With this burden of proof providing the framework for our analysis, we next address relators’ claims.

Ohio Constitution, Article XI, Sections 3, 7, and 10

{¶ 25} Relators assert that the board’s apportionment plan violates the Ohio Constitution, Article XI, Sections 7 and 11. To assist this court in resolving this claim, the parties provided supplemental briefs on whether tension exists among *229 Sections 3, 7, and 10 of Article XI, and if so, how these sections could be harmonized.
{¶ 26} As noted previously, we apply the same rules of construction that we apply in construing statutes to interpret the meaning of constitutional provisions. State ex rel. Colvin v. Brunner, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 43. We must first review the words and phrases used. Id.
{¶ 27} The Ohio Constitution, Article XI, Section 3, provides:
The population of each house of representatives district shall be substantially equal to the ratio of representation in the house of representatives, as provided in section 2 of this Article, and in no event shall any house of representatives district contain a population of less than ninety-five per cent nor more than one hundred five per cent of the ratio of representation in the house of representatives, except in those instances where reasonable effort is made to avoid dividing a county in accordance with section 9 of this Article.
{¶ 28} The Ohio Constitution, Article XI, Section 7, provides:
(A) Every house of representatives district shall be compact and composed of contiguous territory, and the boundary of each district shall be a single nonintersecting continuous line. To the extent consistent with the requirements of section 3 of this Article, the boundary lines of districts shall be so drawn as to delineate an area containing one or more whole counties.
(B) Where the requirements of section 3 of this Article cannot feasibly be attained by forming a district from a whole county or counties, such district shall be formed by combining the areas of governmental units giving preference in the order named to counties, townships, municipalities, and city wards.
(C) Where the requirements of section 3 of this Article cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section, only one such unit may be divided between two districts, giving preference in the selection of a unit for division to a township, a city ward, a city, and a village in the order named.
(D) In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of section 3 of this Article.
*230 {¶ 29} The Ohio Constitution, Article XI, Section 10, provides:
The standards prescribed in sections 3, 7, 8, and 9 of this Article shall govern the establishment of house of representatives districts, which shall be created and numbered in the following order to the extent that such order is consistent with the foregoing standards:
(A) Each county containing population substantially equal to one ratio of representation in the house of representatives, as provided in section 2 of this Article, but in no event less than ninety-five per cent of the ratio nor more than one hundred five per cent of the ratio shall be designated a representative district.
(B) Each county containing population between ninety and ninety-five per cent of the ratio or between one hundred five and one hundred ten per cent of the ratio may be designated a representative district.
(C) Proceeding in succession from the largest to the smallest, each remaining county containing more than one whole ratio of representation shall be divided into house of representatives districts. Any remaining territory within such county containing a fraction of one whole ratio of representation shall be included in one representative district by combining it with adjoining territory outside the county.
(D) The remaining territory of the state shall be combined into representative districts.
{¶ 30} In resolving the tension between these constitutional provisions, we note that Article XI of the Ohio Constitution vests the apportionment board with considerable discretion in formulating an appropriate plan. See Ohio Constitution, Article XI, Section 3 (requiring the population of each house district to be “substantially equal to the ratio of representation” [emphasis added]); Article XI, Section 7(A) (requiring house district boundary lines to be drawn so as to delineate an area that contains one or more whole counties “[t]o the extent consistent with the requirements of section 3” [emphasis added]); Article XI, Section 7(B) (requiring that house districts be formed by combining the areas of governmental units in the order specified where Section 3 population requirements “cannot feasibly be attained” by forming a district from a whole county or counties [emphasis added]); Article XI, Section 7(C) (requiring the division of only one governmental unit in the order specified when the Section 3 population requirements “cannot feasibly be attained” by combining the areas of governmental units in accordance with Section 7(B) [emphasis added]); Article XI, Section *231 7(D) (requiring the adoption of district boundaries established by the preceding apportionment “to the extent reasonably consistent ” with the Section 3 population requirements [emphasis added]).
{¶ 31} This court does not sit as a super apportionment board to determine whether a plan presented by the relators is better than the plan adopted by the board. Instead, we determine whether the board acted within the broad discretion conferred upon it by the provisions of Article XI when it adopted its plan. As respondents observe, whether relators have presented a “better” apportionment plan is irrelevant in determining whether relators have met their burden to establish that the board’s September 30, 2011 apportionment plan is unconstitutional. The role of a supreme court in considering constitutional challenges to an apportionment plan is restricted to determining whether relators have met their burden to prove that the plan adopted by the board is unconstitutional beyond a reasonable doubt. See State ex rel. Cooper v. Tennant, 229 W.Va. 585, 730 S.E.2d 368 (2012), paragraph twelve of the syllabus (“The only role of the Supreme Court of Appeals of West Virginia in determining whether a state legislative redistricting plan is constitutional is to assess the validity of the particular plan adopted by the Legislature under both federal and state constitutional principles, rather than to ascertain whether a better plan could have been designed and adopted”); Wilson v. State ex rel. State Election Bd., 270 P.3d 155, ¶ 1 (Okla. 2012) (litigant’s mere statement that his redistricting plan is better than the plan passed by the state legislature and signed by the governor was insufficient to support claim that the plan was invalid); Arizona Minority Coalition, 220 Ariz. 587, 208 P.3d 676, at ¶ 46 (“the fact that a ‘better’ [redistricting] plan exists does not establish that this plan lacks a reasonable basis”).
{¶ 32} In fulfilling our limited role, we read together the constitutional provisions that are in pari materia, and we attempt to give full application to every part of each of them unless they are irreconcilable and in hopeless conflict. See Smith v. Leis, 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 57. If there is an irreconcilable conflict, the special provision prevails over the general provision, unless the general provision was adopted later and the manifest intent is that the general provision prevail. Summerville v. Forest Park, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 26-27.
{¶ 33} But if the sections are coequal — that is, if neither is more specific and both were adopted at the same time — then the apportionment board is empowered to apply either one of them. Voinovich, 63 Ohio St.3d at 200, 586 N.E.2d 1020. Consequently, when coequal provisions of Article XI of the Ohio Constitution are irreconcilable, the apportionment board has the duty to choose the proper course, and this court will not order it to correct one constitutional violation by committing another. Id.
*232 {¶ 34} One of the main considerations of the joint secretaries in formulating their proposed plan was preserving the boundaries of existing legislative districts, which is consistent with the requirement of Section 7(D). Moreover, apportionment boards have historically treated the division of noncontiguous local governmental units as not constituting a violation of Sections 7(A), (B), or (C). In 1981, the apportionment board did not count 16 divisions of noncontiguous governmental units as divisions for purposes of Article XI; in 1991, the apportionment board did not count 25 such divisions; and in 2001, the apportionment board did not count 34 of these divisions. The board considered the division of noncontiguous governmental units as having been accomplished by local officials through annexation rather than by the board through apportionment. This practice of not counting divisions of noncontiguous governmental units has been followed by apportionment boards that have had both Democratic and Republican majorities. Additionally, comparison between the 2011 and 2001 apportionment plans indicates that the number of divisions of counties in both plans is comparable (74 for the 2011 apportionment plan and 73 for the 2001 apportionment plan).
{¶ 35} In fact, by retaining district boundaries similar to those in the previous apportionment plan — -and thereby enhancing representational continuity for district residents — the board’s plan is more compliant with Section 7(D) than the alternative plan that was timely submitted to the apportionment board by the Joint Democratic Caucuses or, for that matter, the alternative plans submitted by relators’ expert, Professor Michael McDonald.
{¶ 36} Relators argue that the board erred in relying on Section 7(D) to justify violations of Sections 7(A), (B), and (C) because Section 7(D) is subordinate to the other subsections. They claim that because Section 7(D) is the last subsection, it is also last in priority.
{¶ 37} A review of the plain text of Section 7, however, dispels that contention. Sections 7(A), (B), and (C) are interconnected so that if the Section 3 population requirements cannot feasibly be attained by drawing the line according to Section 7(A), then Section 7(B) is followed, and if they cannot feasibly be attained by following Section 7(B), then Section 7(C) is followed. Section 7(D), however, is not phrased in a manner that subordinates it to Sections 7(A), (B), and (C). Instead, Section 7(D) is phrased to apply broadly to the board’s “new apportionment” and, like Sections 7(A), (B), and (C), is governed by the population requirements of Section 3. There is no language suggesting that Section 7(D) may be followed only if Sections (A), (B), and (C) are inapplicable.
{¶ 38} Therefore, the Ohio Constitution, Article XI, Section 7(D) is coequal with Article XI, Sections 7(A), (B), and (C), and in accordance with Voinovich, 63 Ohio St.3d at 200, 586 N.E.2d 1020, the court will not order the apportionment *233 board to correct a violation of Sections 7(A), (B), and (C) by violating Section 7(D).
{¶ 39} Relators next assert that even if Section 7(D) is coequal with Sections 7(A), (B), and (C), that fact does not justify respondents’ alteration of previous district boundaries from the 2001 apportionment plan. That is, relators contend that pursuant to Section 7(D), “if a prior district’s population is ‘reasonably consistent with the requirements of Section 3,’ then the ‘district boundaries established by the preceding apportionment shall be adopted.’ ”
{¶ 40} But once again, relators ignore the plain text of Section 7(D), which provides, “In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of section 3 of this Article.” (Emphasis added.) In essence, relators’ interpretation replaces the phrase, “to the extent” — a phrase that vests the apportionment board with discretion — with the conditional term “if.” But this interpretation changes the meaning of Section 7(D), which we cannot do. See State ex rel. Russo v. McDonnell, 110 Ohio St.3d 144, 2006-Ohio-3459, 852 N.E.2d 145, ¶ 50 (in construing statutes, court cannot add or delete language); State ex rel. LetOhioVote.org v. Brunner, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 49 (courts are not authorized to add exceptions that are not contained within the express language of constitutional provisions).
{¶ 41} Therefore, the Ohio Constitution vests discretion in the apportionment board to adopt the prior district’s boundaries “to the extent reasonably consistent” with the Section 3 population requirements, and this discretionary language confers the authority on the apportionment board to adopt district boundaries that are not identical to those used in the prior apportionment.
{¶ 42} Relators’ claims focus on the board’s divisions of governmental units. Because those divisions were warranted by both the bipartisan historical practice of prior apportionment boards and the Section 7(D) requirement of keeping boundaries similar to those used in the prior apportionment, we will not order respondents to correct the alleged violations of Sections 7(A), (B), and (C) by committing a violation of Section 7(D). Similarly, given the discretion accorded respondents under Section 7(D) and the related provisions, relators have not established by proof beyond a reasonable doubt that respondents’ purported failure to use the exact same boundary lines as the 2001 apportionment plan for a few districts constituted a violation of that section.

Relators’ Evidence

{¶ 43} Relators primarily rely on the two alternative apportionment plans of their expert, Professor McDonald, to meet their heavy burden of proof in this *234 special proceeding. For the following reasons, however, these alternative plans are insufficient to carry that burden.
{¶ 44} First, they appear to be based on the same flawed interpretation of Section 7(D) advocated by relators.
{¶ 45} Second, as previously discussed, whether a litigant has presented a “better” apportionment plan is irrelevant to the court’s determination of whether the plan adopted by the apportionment board is constitutional. See Cooper, 730 S.E.2d 368, at paragraph twelve of the syllabus; Arizona Minority Coalition, 220 Ariz. 587, 208 P.3d 676, at ¶ 46.
{¶ 46} Third, Professor McDonald’s affidavits are replete with conclusory statements that lack specific factual support. For example, he states that the apportionment board’s plan “split over 250 political subdivisions,” while each of his alternative plans “divides less than 100 subdivisions,” but he offers no detañed explanation of what he counted as a split or division, and he does not enumerate each of the subdivisions split by the various plans. In the absence of more detailed factual support, we are left to wonder about the analytical choices made by relators’ expert and the concomitant viability of his conclusions. And insofar as relators argue that Professor McDonald’s plans contain many fewer divisions of governmental units than are contained in the board’s plan and do not violate any other constitutional provisions, his affidavits simply contain insufficient evidence to establish the truth of their assertion. Indeed, from his affidavits, it is unclear whether Professor McDonald even considered all the applicable criteria, unlike respondents, who established that they had considered all the applicable criteria in formulating and adopting their plan. Notably, in an unrelated case, a federal district court recently held that Professor McDonald’s expert opinion was unreliable because, among other reasons, he failed to consider all the applicable principles that guide redistricting. Backus v. South Carolina, 857 F.Supp.2d 553, 562 (D.S.C.2012). His conclusory opinion here appears to be similarly defective.
{¶ 47} Finally, relator claims that courts have regularly relied on a litigant’s alternative plans in assessing the validity of an apportionment plan, citing Holt, 38 A.3d 711, Twin Falls Cty. v. Idaho Comm, on Redistricting, 152 Idaho 346, 271 P.3d 1202 (2012), and In re Reapportionment of the Colorado Gen. Assembly, — P.3d-, 2011 WL 5830123. But in each of these cases, the alternative plans reviewed by the courts were timely submitted to the state’s apportionment body for its review in the process of adopting a plan. Holt at 753-754 and fn. 32; Twin Falls at 1206-1207; Reapportionment of the Colorado Gen. Assembly at *3-4. By contrast, both of Professor McDonald’s alternate apportionment plans were not timely submitted to the apportionment board, but were instead submitted as evidence in a case filed more than three months after the board approved its 2011 plan.
*235 Conclusion
{¶ 48} The role of this court in adjudicating challenges to apportionment is limited: we consider the plan against the requirements of the United States and Ohio Constitutions, as interpreted by federal and state decisional law. In making our determination, we accord the apportionment board the deference it is afforded by the constitution in attempting to take into account various federal and state requirements by placing the burden on one challenging an apportionment plan to establish its unconstitutionality beyond a reasonable doubt. Relators have failed to adduce sufficient, credible proof to carry this heavy burden. Therefore, relators are not entitled to a declaration that the 2011 apportionment plan is unconstitutional or a prohibitory injunction to prevent elections from being conducted in accordance with that plan, and we accordingly deny the requested relief.
Relief denied.
Willamowski, Lanzinger, and Cupp, JJ., concur.
O’Connor, C.J., and Pfeifer and McGee Brown, JJ., dissent.
John R. Willamowski, J., of the Third Appellate District, sitting for Lundberg Stratton, J.