**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Neiman v. LaRose*, **Slip Opinion No. 2022-Ohio-2471.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-2471

NEIMAN ET AL. *v*. LAROSE, SECY., ET AL.

LEAGUE OF WOMEN VOTERS OF OHIO ET AL. *v*. LAROSE, SECY., ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Neiman v. LaRose*, **Slip Opinion No. 2022-Ohio-2471.]**

*Redistricting—Original actions under Ohio Constitution, Article XIX, Section 3(A)—The March 2, 2022 congressional-district plan does not comply with Ohio Constitution, Article XIX, Section 1(C)(3)(a) and is invalid—Within 30 days, the General Assembly must pass a new congressional-district plan that complies in full with the Ohio Constitution.*

(Nos. 2022-0298 and 2022-0303—Submitted June 14, 2022—Decided July 19, 2022.)

ORIGINAL ACTIONS filed pursuant to Ohio Constitution, Article XIX, Section 3(A).

_____

**Per Curiam.**

## I. INTRODUCTION

{¶ 1} On January 14, 2022, this court held that the congressional-district plan passed by the General Assembly and signed by the governor in November 2021 was invalid in its entirety. *Adams v. DeWine*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, ¶ 5, 102. We held that the plan unduly favored the Republican Party and disfavored the Democratic Party in violation of Article XIX, Section 1(C)(3)(a) of the Ohio Constitution and that it unduly split Hamilton, Cuyahoga, and Summit Counties in violation of Article XIX, Section 1(C)(3)(b). *Adams* at ¶ 5, 102. We ordered the General Assembly to adopt a new plan that complied with Article XIX and that "[was] not dictated by partisan considerations." *Adams* at ¶ 102.

{¶ 2} Under Article XIX, Section 3(B)(1), the General Assembly had 30 days in which to pass a new plan. The General Assembly failed to pass a plan within that time, so under Section 3(B)(2), respondent Ohio Redistricting Commission was required to adopt a new plan. The redistricting commission adopted a new plan on March 2, 2022. For purposes of this opinion, we call that plan the "March 2 plan."

{¶ 3} Two sets of petitioners have filed original actions challenging the March 2 plan.[1] We hold that the March 2 plan unduly favors the Republican Party and disfavors the Democratic Party in violation of Article XIX, Section 1(C)(3)(a). We order the General Assembly to pass a new congressional-district plan that complies with the Ohio Constitution, as required under Article XIX, Section 3(B)(1).

---

[1]. The petitioners in case No. 2022-0298 are 12 individual voters: Meryl Neiman, Regina C. Adams, Bria Bennett, Kathleen M. Brinkman, Martha Clark, Susanne L. Dyke, Carrie Kubicki, Dana Miller, Holly Oyster, Constance Rubin, Solveig Spjeldnes, and Everett Totty ("the *Neiman* petitioners"). The petitioners in case No. 2022-0303 are the League of Women Voters of Ohio, the A. Philip Randolph Institute of Ohio, and eight individual voters: Bette Evanshine, Janice Patterson, Barbara Brothers, John Fitzpatrick, Janet Underwood, Stephanie White, Renee Ruchotzke, and Tiffany Rumbalski ("the *League* petitioners").

## II. BACKGROUND

### A. Article XIX's remediation process

{¶ 4} Article XIX, Section 3(B)(1) provides that if this court determines that any congressional-district plan is invalid, the General Assembly "shall pass" a congressional-district plan that complies with the Constitution. As we noted in *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 97, Section 3(B)(1) mandates both the timing and substance of any new plan. Section 3(B)(1) provides that the General Assembly must pass a plan "not later than the thirtieth day after the last day on which an appeal of the court order could have been filed or, if the order is not appealable, the thirtieth day after the day on which the order is issued." And the plan "shall remedy any legal defects in the previous plan identified by the court but shall include no changes to the previous plan other than those made in order to remedy those defects." *Id.*

{¶ 5} If the General Assembly does not timely pass a remedial plan, "the Ohio redistricting commission shall be reconstituted and reconvene and shall adopt a congressional district plan" in accordance with the Constitution. *Id.* at Section 3(B)(2). Again, the Constitution "mandates both the timing and substance of the commission's actions." *Adams* at ¶ 98. Section 3(B)(2) states, "The commission shall adopt that plan not later than the thirtieth day after the deadline described [in Section 3(B)(1)]," and such plan "shall remedy any legal defects in the previous plan identified by the court but shall include no other changes to the previous plan other than those made in order to remedy those defects."

### B. The General Assembly did not pass a remedial plan

{¶ 6} We issued our decision in *Adams* on January 14, 2022. On February 2, Blake Springhetti, an employee of the House Republican caucus and a drawer of the plan that we invalidated in *Adams*, *id.* at ¶ 15-17, sent an email with the subject line "Proposed Plan Information" to respondent Speaker of the House Robert Cupp. The email included attachments with what appear to be maps of proposed

congressional districts. On February 5, the Senate scheduled committee hearings for congressional redistricting. Those committee hearings were canceled, and the General Assembly did not vote on or pass a new congressional-district plan by the February 13 deadline for passing a plan under Article XIX, Section 3(B)(1).

{¶ 7} House Speaker Cupp later said that because of the 90-day referendum period for new laws, he believed the legislature did not have enough time to enact a new plan before the May 3, 2022 primary election.[2] He pointed out that any plan adopted by the commission would instead become effective immediately and therefore allow Ohio to maintain the May 3 primary date regarding the election of members to Congress.

## C. President of the Senate Huffman introduces a plan to the commission

{¶ 8} As a result of the General Assembly's failure to act, the responsibility for congressional redistricting transferred to the commission on February 14. On February 21, Springhetti sent an email with the subject line "Congressional Plan Information" to the office of Auditor of State Keith Faber, a commission member. The email again included attachments with what appear to be maps of proposed congressional districts.

{¶ 9} On February 22, the commission first met to discuss congressional redistricting. House Speaker Cupp said that he and the other commission cochair, Senator Vernon Sykes, had asked their staffs to begin working together to draft a proposed congressional-district plan. The commission also announced that it would schedule hearings so that members of the public could testify about proposed plans that they had submitted to the commission. The commission held those hearings on February 23 and 24. On February 22, Dr. Kosuke Imai, a statistics

---

2. A plan passed by the General Assembly would have become effective immediately if it were passed as emergency legislation with sufficient bipartisan support. *See* Ohio Constitution, Article II, Section 1d.

expert retained by the *League* petitioners, submitted his own plan to the commission.

{¶ 10} On February 25, respondent President of the Senate Matt Huffman sent letters to the other commission members advising them that Ray DiRossi, an employee of the Senate Republican caucus and a drawer of the plan that we invalidated in *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 15-18, was available to meet with the other commission members. House Speaker Cupp sent a similar letter inviting the other commission members to work with Springhetti. On Sunday, February 27, DiRossi and Springhetti met with the staffs of the commission's two Democratic Party members, Senator Sykes and House Minority Leader Allison Russo. Senator Sykes later described that meeting as a "one way communication" because, in his view, Democratic staffers shared their ideas at the meeting but the Republican map drawers were not as forthcoming. Senate President Huffman disagreed with Senator Sykes's characterization of the meeting.

{¶ 11} Regardless, Senator Sykes and House Minority Leader Russo both indicated that during the meeting, DiRossi and Springhetti did not share any proposed plans with the Democratic staffers. Another commission member, respondent Secretary of State Frank LaRose, acknowledged that he had first viewed a "working draft" of a new congressional-district plan on February 27—the same day as the Republican map drawers' meeting with the Democratic staffers. And on the same date, Secretary LaRose texted Auditor Faber a screen shot of a district plan that was very similar to the plan that the commission later adopted on March 2.

{¶ 12} When the commission met again on Tuesday, March 1, Senate President Huffman introduced a proposed congressional-district plan. House Minority Leader Russo said that because she had received a copy of the proposal

just a short time before the meeting, she had had only a few minutes to review it. House Minority Leader Russo had several questions about the proposal.

{¶ 13} First, she asked why the proposal combined Cincinnati with Warren County instead of keeping Cincinnati within a district entirely within Hamilton County. She also asked whether the proposal addressed this court's concern in *Adams* about carving out Hamilton County's Black population from surrounding neighborhoods. In response, Senate President Huffman said that pursuant to Article XIX, Section 3(B)(2), "we"—presumably referring to himself, House Speaker Cupp, and their map drawers—had tried to remedy the defects identified by this court in *Adams* and that the new plan comported with this court's decision. "After that," he said, "there are still policy preferences and choices that commission members make." He said that although House Minority Leader Russo may prefer that Cincinnati be contained within a district entirely within Hamilton County, "[w]e think this is a better version of the map."[3] He further said that racial data was not used when drawing the proposal.

{¶ 14} Second, House Minority Leader Russo asked why proposed Districts 5 and 9 in northwest Ohio were drawn the way they were and, more specifically, why Lucas County was not drawn into a more compact district with Lorain County. Among other things, Senate President Huffman said that District 9 remained unchanged from the original map "because the court did not comment" on that district and "the constitutional charge" was to remedy the defects that this court identified in its opinion in *Adams*.

{¶ 15} Third, House Minority Leader Russo asked why portions of Franklin County in proposed District 15 were combined with far-away counties rather than

---

3. As petitioners have pointed out in their briefs, in the proposed maps that Springhetti emailed to House Speaker Cupp on February 2 and to Auditor Faber on February 21, District 1 was wholly within Hamilton County. In Senate President Huffman's March 1 proposal, however, District 1 straddled two counties and combined Cincinnati with Warren County.

the neighboring counties of Delaware or Union Counties. Senate President Huffman responded that a "phenomenon" of drawing compact districts is that ultimately a district will be made up of the "left over" parts of other districts, which he referred to as a "Frankenstein district." Senate President Huffman suggested that proposed District 15 was one such district but that the plan had nevertheless remedied the defects identified by this court in *Adams*.

{¶ 16} Fourth, House Minority Leader Russo asked why proposed District 7 combined the western and southern suburban areas of Cuyahoga County with dissimilar counties to the south, which included Amish Country, rather than creating a more compact district by combining the Cuyahoga County areas with areas to the west or east of Cuyahoga County. Senate President Huffman responded that regarding northeast Ohio, the proposed plan had, for the most part, created very compact districts and that the Polsby-Popper scoring method had rated the proposal as just as compact or more compact than a plan that had been proposed by Senate Democrats.[4] For example, he noted that the proposed new District 13, which he described as a "[D]emocratic drawn district," would include all of Summit County, which was "what the court specifically provided." He acknowledged that proposed District 7 "is a little like [the] 15th where it's made up of parts," but he also noted that it included two whole counties and was drawn so that the plan complied with this court's directive in *Adams* not to split Cuyahoga County into more than two districts.

{¶ 17} After commission members discussed whether a bipartisan vote was required to adopt a new plan, the commission agreed to meet again the following day.

---

4. The Polsby-Popper score is a statistical method accepted by political scientists for measuring the compactness of a district.

**D. The commission adopts the March 2 plan**

{¶ 18} At the beginning of the March 2 meeting, Senator Sykes moved the commission to adopt a congressional-district plan proposed by the Senate Democrats that consisted of eight Republican and seven Democratic districts. After the commission voted five to two along party lines to reject the proposal, Senate President Huffman moved the commission to adopt his plan, which included two "slight changes" from the map that he had introduced the day before.

{¶ 19} House Minority Leader Russo proposed an amendment to Senate President Huffman's plan that she believed would make the plan comply with this court's decision in *Adams* and not unduly favor Republicans and disfavor Democrats. Her amendment included four proposals: (1) changing Districts 1 and 8 so that District 1, which included Cincinnati, would be wholly within Hamilton County and District 8 would include Warren County, (2) swapping territory in northwest Ohio in Districts 5 and 9 to make District 9 more compact and not a toss-up district, (3) modifying Districts 3, 4, and 15 in central Ohio to create a more compact District 15 that would have a partisan index "slightly above the toss-up range" (presumably more in favor of Democrats) and better link more "cohesive" communities, and (4) modifying Districts 7 and 11 in Cuyahoga County so that District 7 would become a Democratic-leaning toss-up district.

{¶ 20} Senate President Huffman opposed the proposed amendment and opined that the standards set forth in Article XIX, Sections 1(C)(3)(a) and 1(C)(3)(b) did not apply to the commission at that stage of the redistricting process. House Speaker Cupp said, among other things, that the proposed amendment would not solve any of the alleged problems with Senate President Huffman's proposal. For example, he noted that in Senate President Huffman's proposal, District 15 stretched from Columbus to western Ohio "because it was a remnant of other changes." But House Minority Leader Russo's proposed changes to District 15, House Speaker Cupp said, would make District 4 less compact. House Speaker

Cupp also said that Senate President Huffman's proposal complied with our decision in *Adams*, particularly because it no longer split Hamilton County twice.

**{¶ 21}** House Minority Leader Russo asked that the commission "take a day" to attempt to reach a bipartisan compromise and avoid further court intervention, but the commission voted five to two along party lines to reject her amendment. Without further discussion, the commission also voted five to two, again along party lines, to adopt Senate President Huffman's proposal as the new congressional-district plan.

### E. Petitioners file motions to enforce this court's judgment and for leave to amend their complaints

**{¶ 22}** A few days after the commission adopted the March 2 plan, the petitioners in the *Adams* litigation filed motions to enforce this court's January 14, 2022 order, arguing that the March 2 plan violated Article XIX, Sections 1(C)(3)(a) and 1(C)(3)(b) of the Ohio Constitution. *See* Supreme Court case No. 2021-1428 (Mar. 4, 2022); Supreme Court case No. 2021-1449 (Mar. 7, 2022). In response, Senate President Huffman and House Speaker Cupp argued, among other things, that this court lacked jurisdiction to grant the requested relief. *See* Supreme Court case No. 2021-1428 (Mar. 8, 2022); Supreme Court case No. 2021-1449 (Mar. 10, 2022). The petitioners then filed motions for leave to amend their complaints to add the commission as a party and to add new claims. *See* Supreme Court case No. 2021-1428 (Mar. 11, 2022); Supreme Court case No. 2021-1449 (Mar. 11, 2022). On March 18, we denied the motions to enforce as procedurally improper, noting that we had not retained jurisdiction to review any remedial district plan and that the petitioners could not, through a motion to enforce, challenge the validity of the March 2 plan. We also denied the motions for leave because the petitioners had improperly sought to add new claims that arose after final judgment. *Adams v. DeWine*, 166 Ohio St.3d 1431, 2022-Ohio-871, 184 N.E.3d 111; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 166 Ohio St.3d 1432, 2022-Ohio-871, 184 N.E.3d 112.

### F. Petitioners file new complaints

{¶ 23} Less than a week after we denied the postjudgment motions in the *Adams* litigation, two new lawsuits were filed in this court challenging the March 2 plan. The first case, case No. 2022-0298, was filed by the *Neiman* petitioners. The second case, case No. 2022-0303, was filed by the *League* petitioners. In the complaints in both cases, the petitioners named four respondents: Secretary LaRose in his official capacity as secretary of state, House Speaker Cupp in his official capacity as House speaker, Senate President Huffman in his official capacity as Senate president, and the commission.

{¶ 24} The *Neiman* petitioners requested a highly expedited scheduling order so that this court could resolve their claims before the May 3 primary election. Although the *League* petitioners also sought an expedited scheduling order, they did not seek relief for the 2022 election. Secretary LaRose, Senate President Huffman, and House Speaker Cupp opposed petitioners' requests to expedite the cases. Among other arguments, Senate President Huffman and House Speaker Cupp argued that they needed time to engage in meaningful discovery pertaining to petitioners' experts. On March 29, we issued a scheduling order that expedited these matters but set briefing and evidence deadlines past the May 3 primary date. 166 Ohio St.3d 1452, 2022-Ohio-1016, 184 N.E.3d 138. We also consolidated the two cases. *Id.*

{¶ 25} The parties submitted evidence by April 25 and completed briefing on June 1. As evidence, the parties filed five new expert reports relating to the March 2 plan and a voluminous number of documents—many in response to petitioners' discovery requests. Although House Speaker Cupp and Senate President Huffman retained an expert to review the documents produced by one of petitioners' experts, they did not depose any of petitioners' experts.

{¶ 26} On May 3, Ohio held a primary election that included voting for candidates in congressional districts drawn under the March 2 plan.

### III. ANALYSIS

#### A. The burden and standard of proof

{¶ 27} In *Adams*, we held that the first congressional-district plan was presumptively constitutional because it was passed as legislation by the General Assembly. *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 26. Although the March 2 plan was adopted by the commission, it is also entitled to a presumption of constitutionality. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 76 (holding that a General Assembly–district plan adopted by the commission was presumptively constitutional). Accordingly, as in *Adams*, petitioners have the burden of proving that the March 2 plan violates the Constitution. *See Adams* at ¶ 26. In *Adams*, we assumed that petitioners' challenge was subject to the highest standard of proof: proof beyond a reasonable doubt. *Id*. at ¶ 29. We do not defer to the commission on questions of law. *See id*. at ¶ 28.

#### B. The commission had to remedy the original congressional-district plan's defects

{¶ 28} Article XIX, Section 1(C)(3) of the Ohio Constitution states that if *the General Assembly* passes a congressional-district plan by a simple majority in each house, it "shall not pass a plan that unduly favors or disfavors a political party or its incumbents," Section 1(C)(3)(a), and "shall not unduly split governmental units," Section 1(C)(3)(b). Senate President Huffman, House Speaker Cupp, Senator Rob McColley, and Representative Jeff LaRe assert that Section 1(C)(3) refers to a plan passed by the General Assembly, not to a plan adopted by the commission.[5] They argue that Section 1(C)(3) does not apply to remedial plans

---

5. Senator McColley and Representative LaRe were not named as parties in the original complaints. They filed a motion for leave to file an amended notice of their substitution, notifying the court that they had been appointed to the commission to replace Senate President Huffman and House Speaker Cupp, who are no longer members of the commission. To the extent the commission is a party,

adopted by the commission and that Article XIX permits all commission-adopted plans to unduly favor a political party and unduly split governmental units. We reject this argument.

{¶ 29} The commission's constitutional duty is to adopt a congressional-district plan to replace the original, invalidated plan. That duty arises under Article XIX, Section 3(B)(2), which requires the replacement plan to "remedy any legal defects in the previous plan identified by the court." The legal defects in the original congressional-district plan were the commission's failure to comply with Section 1(C)(3)(a) and Section 1(C)(3)(b). *See Adams* at ¶ 41-71, 84-93. The commission was required to fix those problems.

{¶ 30} Contrary to the arguments of Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe, this court's order that the commission correct the General Assembly's noncompliance with Section 1(C)(3)(a) and Section 1(C)(3)(b) does not effectively rewrite Section 1(C)(3). The commission's constitutional duty arises under Section 3(B)(2), not Section 1(C)(3). According to Article XIX, Section 3(B)(2), the commission may not ignore the legal defects in the original congressional-district plan that this court identified. Indeed, the commission has a constitutional duty to *remedy* the defects in the previous plan.

{¶ 31} Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe argue that requiring the commission to remedy the General Assembly's noncompliance with Section 1(C)(3) would incentivize "the minority party" to vote against a plan. They contend that the language of Article XIX was intended to establish a "safety valve of sorts" by allowing the commission

---

Senator McColley and Representative LaRe asked to be substituted for their predecessors on the commission. The court granted Senator McColley and Representative LaRe's motion. 166 Ohio St.3d 1523, 2022-Ohio-1887, 188 N.E.3d 179. Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe filed a joint merit brief in this matter.

to adopt a remedial plan without being constrained by the anti-gerrymandering provisions that had applied to the General Assembly. But under that interpretation, if the majority-party members of the General Assembly and the commission want to avoid the anti-gerrymandering requirements of Article XIX, Section 1(C)(3), they can simply refuse to comply with those requirements when adopting both an original plan and a remedial plan. In other words, the majority party in the General Assembly could simply ignore the anti-gerrymandering requirements when adopting an original plan, knowing that if this court rejects that plan and if the duty to adopt a legislative-districting plan is transferred to the commission, then the commission would be free to adopt a plan that likewise disregards the anti-gerrymandering requirements that were overwhelmingly approved by Ohio voters. The result would be the absence of any incentive to comply with Article XIX, Section 1(C)(3) of the Ohio Constitution. No constitutional language suggests that the voters who approved Article XIX intended to allow the prohibitions against partisan favoritism and unduly splitting governmental units to be avoided so easily.

### C. Article XIX, Section 1(C)(3)(a)

{¶ 32} In *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 40, we explained that Section 1(C)(3)(a)'s requirement that a plan not unduly favor or disfavor a political party or its incumbents "does not prohibit a plan from favoring or disfavoring a political party or its incumbents to the degree that inherently results from the application of neutral criteria, but it does bar plans that embody partisan favoritism or disfavoritism in excess of that degree—i.e., favoritism not warranted by legitimate, neutral criteria." We held that the evidence overwhelmingly showed that the original congressional-district plan violated that standard. *Id*. at ¶ 41, 69, 71. As discussed below, similar evidence presented in these cases shows that the March 2 plan also unduly favors the Republican Party and unduly disfavors the Democratic Party in violation of Article XIX, Section 1(C)(3)(a) of the Ohio Constitution.

### 1. *Misunderstanding the applicable standard*

**{¶ 33}** To start, it is notable that Senate President Huffman and House Speaker Cupp do not believe that the commission is required to refrain from unduly favoring one political party over the other. At the March 2 meeting, Senate President Huffman explained at length his belief that the commission is not constrained by the standard set forth in Article XIX, Section 1(C)(3)(a) of the Ohio Constitution. This fact alone shows that he, as the main proponent of the March 2 plan, was not operating with the goal of proposing a plan that did not unduly favor the Republican Party. Moreover, the drafters of the March 2 plan—DiRossi and Springhetti—ensured that any changes in partisan favoritism from the original, invalidated plan to the March 2 plan would be minimal when they wrongly viewed Article XIX, Section 3(B)(2)'s requirement to remedy the defects to be unnecessary or even unwarranted—despite our invalidation of the original plan "in its entirety," *id*. at ¶ 5, due to its systemic bias and our statement that the plan "defies correction on a simple district-by-district basis," *id*. at ¶ 96.

### 2. *Expected performance*

**{¶ 34}** In *Adams*, we began by examining how the two major political parties were expected to perform under the original plan. *Id*. at ¶ 42. We relied on the expert evidence that had been submitted showing that Republicans were likely to win 80 percent of the seats (i.e., 12 out of 15) under that plan, despite receiving only about 53 percent of the vote in recent statewide elections. *Id*. at ¶ 47-50. We concluded that the original plan was a statistical outlier, exhibiting significant bias in favor of the Republican Party. *Id*.

**{¶ 35}** The parties have now submitted evidence showing that the March 2 plan is only slightly less favorable to the Republican Party (or more favorable to the Democratic Party) than the original plan. The March 2 plan has five Democratic-leaning districts and ten Republican-leaning districts. But three of the five Democratic-leaning districts have Democratic vote shares very close to 50

percent (52.15, 51.04, and 50.23 percent). Dr. Christopher Warshaw, an associate professor of political science at George Washington University who has written about elections and partisan gerrymandering, calculates—with a variety of methods and data sets—that Democrats will likely still win only three seats under the March 2 plan in an average election. Dr. Jonathan Rodden, a professor of political science at Stanford University with expertise in the analysis of fine-grained geospatial data sets, including election results, predicts that it is most likely that Democrats will win four seats—only a one-seat improvement from the original plan. Senate President Huffman and House Speaker Cupp do not dispute these projections.

{¶ 36} The March 2 plan creates just three seats with Democratic vote shares over 52 percent (and one of those is at 52.15 percent). By contrast, all the Republican-leaning seats comfortably favor Republican candidates. The most competitive Republican-leaning district has a 53.32 percent Republican vote share. Thus, the best-case projected outcome for Democratic candidates under the March 2 plan is that they will win four—roughly 27 percent—of the seats. Considering that Democratic candidates have received about 47 percent of the vote in recent statewide elections, this probable outcome represents only a modest improvement over the invalidated plan. Indeed, according to Dr. Imai, any plan in which Democratic candidates are likely to win fewer than six seats is considered a statistical outlier.

### 3. Comparisons focusing on urban counties

{¶ 37} In *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, we also were persuaded by evidence showing that the original plan maximized the number of Republican-leaning districts by "cracking" and "packing" Democratic voters in several urban counties. *Id*. at ¶ 53-54, 58, 61. We noted substantial evidence showing that the original plan contained districts in Ohio's three largest metropolitan areas that were shaped not by neutral political geography but by an effort to "pack" and "crack" Democratic voters—resulting in more districts in

which Republican candidates were strongly favored or at least competitive. *Id*. at ¶ 56-62.

{¶ **38**} Petitioners have presented similar evidence concerning the March 2 plan. With respect to the Cincinnati area, Dr. Imai concludes that the March 2 plan has no safe Democratic seat in Hamilton County. Dr. Imai compared the partisan vote share of the district that each precinct in Hamilton County is assigned to in the March 2 plan against the vote share of each precinct's assigned district in each of the 5,000 simulated plans he created. His analysis shows that the simulated plans would expect voters in Cincinnati and a large area of northern Hamilton County to be included in a Democratic-leaning district. As shown in the map below, the March 2 plan draws a district line directly through the Democratic area, carving it into two districts—one of which, as in the original plan, connects Cincinnati to mostly rural Warren County through a narrow strip of land.



As Dr. Imai explained, "in Hamilton County, the [March 2] plan turns one safe Democratic district into a toss-up district by cracking Democratic voters."

{¶ **39**} Dr. Jowei Chen, an associate professor of political science at the University of Michigan who has published academic papers on legislative

redistricting and political geography, concluded that the districts in Hamilton County are outliers in terms of both compactness and partisanship. He found that the March 2 plan's Cincinnati district has a higher Republican vote share than 84.2 percent of the simulated plans' districts containing Cincinnati. The March 2 plan achieves this result by connecting Cincinnati to Warren County instead of adjacent areas in Hamilton County. Dr. Chen notes that the March 2 plan's District 1 is less compact than the vast majority of simulated districts, having a lower Polsby-Popper score than 96.9 percent of the simulated districts containing Cincinnati. Dr. Imai reached a similar conclusion regarding the compactness of the March 2 plan's District 1: it is far less compact than expected based on his simulated plans.

{¶ 40} With respect to the Columbus area, Dr. Imai's simulated plans would expect all of Franklin County and parts of Delaware County and Fairfield County to belong to Democratic-leaning districts. But according to Dr. Imai, the March 2 plan packs Democrats into District 3 and cracks the rest into other districts, including District 15—which encompasses downtown Columbus and stretches into Shelby County, as shown in the map below.



Dr. Imai concludes that this allowed the commission to create an additional Republican district beyond what would be expected.

{¶ 41} Dr. Chen states that the two Columbus districts in the March 2 plan are more favorable to Republican candidates than the majority of those in his simulated plans: District 3 is more heavily Democratic than 89.6 percent of the simulated plans' districts containing the most Columbus population, while District 15 is more heavily Republican than 99.4 percent of the simulated plans' districts containing the second-highest Columbus population. Dr. Chen states that District 15 is also less compact than nearly every simulated district with the second-highest Columbus population. Dr. Imai similarly found District 15 to be far less compact than expected based on his simulated plans. Dr. Chen concludes that the two Columbus districts were engineered to create a more Republican-friendly outcome, achieved in part by sacrificing the compactness of District 15.

{¶ 42} Finally, with respect to the Cleveland area, Dr. Chen concludes that the Cleveland-based district in the March 2 plan is more heavily Democratic than 98.8 percent of the simulated plans' Cleveland-based districts, while the district with the second-highest Cuyahoga County population is more Republican than 100 percent of the simulated plans' districts with the second-highest Cuyahoga County population. All of Dr. Chen's simulated plans have one safe Democratic district based in Cleveland and a second competitive or Democratic-leaning district that includes parts of Cuyahoga County. In contrast, the March 2 plan packs Democrats into District 11, making District 7 safely Republican. Both districts, according to Dr. Chen, "are significantly less geographically compact than the vast majority of their geographically analogous districts in the simulated plans."

{¶ 43} Dr. Imai submitted an example plan (which was also submitted to the commission on February 22) showing a more compact treatment of all three of Ohio's largest urban areas and containing six districts favoring Democrats. According to Dr. Imai, his example plan shows it is possible to apply Article XIX

18

of the Ohio Constitution to Ohio's political geography without favoring the Republican Party to the degree the March 2 plan does.

{¶ 44} In *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 62, we held that the original plan contained oddly shaped districts in each of Ohio's three largest metropolitan areas and that the "inescapable conclusion" was that those districts were "the product of an effort to pack and crack Democratic voters." As the above expert analyses demonstrate, those problems persist in the March 2 plan.

### 4. Additional comparisons

{¶ 45} Dr. Imai compared the partisan vote shares of the March 2 plan's districts with those of his 5,000 simulated plans and concluded that the three most competitive Democratic-leaning districts in the March 2 plan are much less Democratic-leaning than almost all of the Democratic-leaning districts in his simulated plans. One of those districts in the March 2 plan has a Republican vote share that is 1.9 standard deviations above the median Republican vote share of the comparable districts in the simulated plans and has a Republican vote share that is higher than the Republican vote share in 86.6 percent of the simulated plans' counterpart districts. The other two districts have Republican vote shares that are 2.8 and 3.5 standard deviations above the median for comparable districts in the simulated plans and are higher than 99.75 percent of the simulated plans' counterpart districts.

{¶ 46} Dr. Imai also identified two districts that are slightly Republican-leaning toss-up districts under the simulated plans yet are safely Republican under the March 2 plan. These districts (District 10 and District 15) have Republican vote shares that are 3.4 and 5.5 standard deviations above the median of comparable simulated districts. And he analyzed the districts at the extremes of vote share for each party, concluding that the two most-Democratic districts (District 3 and District 11) are packed, having lower Republican vote shares than counterpart districts in the simulated plans. By contrast, the most-Republican districts are less

packed, containing lower Republican vote shares than expected based on the simulated plans. This analysis leads Dr. Imai to conclude that the March 2 plan favors Republicans "by turning Democratic-leaning districts into toss-up districts while making slightly Republican-leaning districts into safe Republican districts."

{¶ 47} Dr. Chen similarly compared the March 2 plan to his 1,000 simulated plans, leading him to conclude that the March 2 plan "is an extreme partisan outlier, both at a statewide level and with respect to the partisan characteristics of its individual districts." As noted above, according to Dr. Chen, the most-Democratic district in the March 2 plan (District 11 in Cleveland) is more heavily Democratic than 98.8 percent of the most-Democratic districts in each of Dr. Chen's 1,000 simulated plans. The second-most-Democratic district in the March 2 plan (District 3 in Columbus) is more heavily Democratic than 90.4 percent of the second-most-Democratic districts in each of the simulated plans. In comparison, the most-Republican district (District 2 in southern Ohio) is *less* heavily Republican than 90.1 percent of the most-Republican districts in Dr. Chen's simulated plans.

{¶ 48} According to Dr. Chen, these characteristics "are consistent with an effort to favor the Republican Party by packing Democratic voters into a small number of districts that very heavily favor the Democratic party." Dr. Chen concludes that by allocating more Democratic voters to the most partisan districts, the March 2 plan allocates fewer Democratic voters to other districts, making them more Republican. Dr. Chen notes that four districts in the March 2 plan have higher Republican vote shares than 95 percent of their counterpart districts in the simulated plans, making them unusually safe Republican districts due to the packing of Democratic voters into Districts 2, 3, and 11.

{¶ 49} Using the definition of "competitive" promoted by the proponents of the original congressional-district plan (i.e., having a partisan vote share between 46 and 54 percent), Dr. Chen further concludes that the March 2 plan is a statistical outlier. *See Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 19. The

March 2 plan has nine "safe Republican" districts (one more than the original plan), which is more than the number of safe-Republican districts in 97 percent of Dr. Chen's 1,000 simulated plans. The March 2 plan includes two safe-Democratic districts (the same as the original plan), which is fewer than the number of safe-Democratic districts in 95 percent of the simulated plans.

{¶ 50} Finally, Dr. Chen notes that the March 2 plan is less compact than all 1,000 of his simulated plans under the Polsby-Popper and Reock metrics.[6]

{¶ 51} Dr. Imai's and Dr. Chen's comparison analyses show that the March 2 plan's significant favoritism of the Republican Party did not result from the application of neutral map-drawing criteria.

### 5. *Other measures of partisan bias*

{¶ 52} In *Adams*, we credited expert analysis showing that the original plan unduly favored the Republican Party and disfavored the Democratic Party. __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 63-66. Petitioners have presented similar evidence showing that the March 2 plan likewise unduly favors the Republican Party.

{¶ 53} Dr. Rodden concluded that a 3 percent statewide shift in favor of Democrats (bringing them to 50 percent of the statewide vote) would lead to Democrats winning, at most, five seats (i.e., 33 percent of the seats) under the March 2 plan. A 3 percent shift in favor of Republicans (bringing them to 56 percent of the statewide vote) would lead to Republicans winning 13 seats (i.e., 87 percent of the seats). Dr. Rodden also calculated that the March 2 plan has an

---

6. The Reock score is a method accepted by political scientists to measure the compactness of a district.

efficiency gap of 10 percent, which he says is relatively high in comparison to alternative plans he considered.[7]

{¶ 54} Dr. Rodden further points out that the March 2 plan treats Republican and Democratic incumbents differently. Of 12 Republican incumbents, ten are in safe Republican-leaning districts, one is in a nominally Democratic-leaning district that retains about 70 percent of the population of his previous district, and one did not seek reelection. By contrast, of the four Democratic incumbents, two are in safe Democratic-leaning districts, one is in a district with a bare Democratic majority with only about half of the residents of the new district having been residents of her previous district, and one did not seek reelection.

{¶ 55} Finally, Dr. Warshaw submitted three charts comparing the congressional-district plan that was in effect from 2011 through 2020, the invalidated plan, and the March 2 plan. Applying several social-science metrics to a variety of data sets, Dr. Warshaw shows that the March 2 plan is nearly as biased as last decade's plan and the invalidated plan. This evidence supports the conclusion that the March 2 plan unduly favors the Republican Party.

### 6. Petitioners have satisfied their burden

{¶ 56} Petitioners have satisfied their burden by showing beyond a reasonable doubt that the March 2 plan unduly favors the Republican Party in violation of Article XIX, Section 1(C)(3)(a) of the Ohio Constitution. Comparative analyses and other metrics show that the March 2 plan allocates voters in ways that unnecessarily favor the Republican Party by packing Democratic voters into a few dense Democratic-leaning districts, thereby increasing the Republican vote share of the remaining districts. As a result, districts that would otherwise be strongly Democratic-leaning are now competitive or Republican-leaning districts. In

---

7. The efficiency gap measures the difference between the parties' respective "wasted votes" (i.e., the number of votes above the 50 percent plus 1 that a party needs to win an election), divided by the total number of votes cast.

addition, the March 2 plan carves districts around the state's largest cities to combine Democratic voters in those areas with Republican voters in rural areas, thereby creating more Republican-leaning districts.

{¶ 57} Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe offer little in response to petitioners' evidence. They start by questioning the idea that experts can assist the court in determining whether a plan complies with the standards set forth in Article XIX, Section 1(C)(3)(a). They argue that if the commission were "required to measure the constitutionality of its plans using a specific mathematical test or compactness score, it would have been included in [Article XIX]." But, as we have already concluded, expert analysis is probative of whether a plan unduly favors or disfavors a political party in violation of Section 1(C)(3)(a). *See Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 42-66. And expert analysis is a tool equally as available to respondents as it is to petitioners. There is no rationale to support disregarding the expert analysis submitted by petitioners.

{¶ 58} Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe nevertheless argue that even if we consider petitioners' evidence, it is "conflicting and contradictory." They give two examples. First, they argue that all of Dr. Imai's simulated plans included eight or nine Republican-leaning districts while most of Dr. Chen's simulated plans included ten Republican-leaning districts. Second, they criticize the example plan that Dr. Imai submitted to the commission because it included nine Republican-leaning districts, even though most (80 percent) of his simulated plans included only eight Republican-leaning districts. The fact that the experts have identified a range of probable Republican-leaning seats (rather than a definitive number), they say, shows that the experts' " 'math' is unreliable." These criticisms are unfounded. Even though Dr. Imai and Dr. Chen predict different seat allocations depending on the methods of

analysis and data sets used, their analysis remains probative of whether the March 2 plan unduly favors or disfavors a political party.

{¶ 59} Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe also assert that Dr. Imai has put his "thumb on the scale" and "gam[ed] the math" by using data from six statewide federal elections from 2012 to 2020 (referred to in *Adams* as the "FEDEA dataset") to predict that Republicans should expect to win eight, or maybe nine, seats. *See Adams* at ¶ 19, 48-49. They cite to the analysis of their own expert, Sean P. Trende, who is the senior elections analyst for RealClearPolitics, a company that produces a political website, and a visiting scholar at the American Enterprise Institute focusing on American politics. His analysis shows that when different data sets are applied to Dr. Imai's simulation program, more than eight or nine Republican seats can be expected. Trende's analysis, however, does not undermine the reliability of Dr. Imai's projections. Dr. Imai explained that he used the FEDEA dataset because that was the data set the General Assembly had used in assessing the plan it passed. Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe have not shown and cannot show that Dr. Imai's analysis has been manipulated to derive a particular result favorable to petitioners' cases.

{¶ 60} As a final matter, Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe claim that we should not rely on petitioners' evidence, because there has not been time for full discovery, particularly the cross-examination of petitioners' experts. This argument, too, is not based on sound reasoning. The scheduling order in these cases required the parties to file evidence within 25 days of this court's entry. 166 Ohio St.3d 1452, 2022-Ohio-1016, 184 N.E.3d 138. Depositions of petitioners' experts could have been taken during that time.

**D.  Article XIX, Section 1(C)(3)(b)**

{¶ **61**} Article XIX, Section 1(C)(3)(b) of the Ohio Constitution provides that when the General Assembly passes a congressional-district plan by a simple majority, it "shall not unduly split governmental units, giving preference to keeping whole, in the order named, counties, then townships and municipal corporations." In *Adams*, we explained that "the splitting of a governmental unit may be 'undue' if it is excessive or unwarranted." __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, ¶ 83.  We held that the original congressional-district plan unduly split Hamilton, Cuyahoga, and Summit Counties.  *Id*. at ¶ 5, 77.  The evidence showed that the original plan did not need to split Hamilton and Cuyahoga Counties twice and that it did not need to split Summit County at all.  *Id*. at ¶ 84-93.  The original plan's excessive splitting of these counties resulted in noncompact districts that could not be explained by neutral redistricting criteria and served no purpose other than to confer a significant partisan advantage on the political party that drew the districts. *Id*. at ¶ 77, 88, 93.  Petitioners argue that the March 2 plan, too, unduly splits counties in violation of Section 1(C)(3)(b).

{¶ **62**} As an initial matter, we reject the *League* petitioners' argument that District 15 violates Section 1(C)(3)(b) because it splits five counties.  Section 1(C)(3)(b) prohibits the excessive or unwarranted splitting of individual governmental units, *see Adams* at ¶ 83; it does not limit the number of partial governmental units a single district may include.  The *League* petitioners do not argue that the splitting of any of the individual counties in District 15 was unwarranted.  Rather, they argue that the partial governmental units should not be part of District 15.

{¶ **63**} Petitioners fail to develop any other arguments supporting their claim that the March 2 plan violates Section 1(C)(3)(b).  They focus on the fact that Districts 1 and 15 pair urban areas with rural areas and that those districts have relatively poor compactness scores.  In *Adams*, we recognized that the pairing of

urban and rural areas and poor compactness scores could be problematic *consequences* of unduly splitting certain counties. *See id*. at ¶ 77, 84-93. But under Section 1(C)(3)(b), petitioners must show, as a threshold matter, that the splitting itself—i.e., not just the effects of the splits—is "excessive or unwarranted." *Adams* at ¶ 83. Without that threshold showing, petitioners are merely repeating their claim that the plan unduly favors or disfavors a political party in violation of Section 1(C)(3)(a).

{¶ 64} The *Adams* petitioners showed that the original plan split Hamilton, Cuyahoga, and Summit Counties an excessive number of times. *See id*., __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, at ¶ 87 (crediting evidence that "splitting Hamilton County into three districts is 'statistically anomalous' "); ¶ 90 (noting that Summit County need not be split at all); ¶ 91 (noting that only 8 of Dr. Imai's 5,000 simulated plans split Cuyahoga County twice). Petitioners in these cases again challenge the splitting of Hamilton County, but unlike the original plan, the March 2 plan splits Hamilton County only once (as it must, due to population requirements).[8] Unlike in *Adams*, petitioners have not identified evidence showing that the splitting of the counties in District 1 or 15 is inherently excessive or unwarranted. Petitioners' arguments address only the *manner* in which the March 2 plan splits certain counties. That concern (presented alone, as petitioners have done) relates only to whether the plan unduly favors or disfavors a political party under Section 1(C)(3)(a).

## IV. CONCLUSION

{¶ 65} For the foregoing reasons, the March 2 plan does not comply with Article XIX, Section 1(C)(3)(a) of the Ohio Constitution and is therefore invalid. By operation of Article XIX, Section 3(B)(1), within 30 days, the General Assembly must pass a plan that complies with the Constitution. If the General

---

8. Hamilton County's population (830,639 as of the most recent federal decennial census) is too large to be contained in a single congressional district.

Assembly fails to do so, Article XIX, Section 3(B)(2) will require the commission to adopt a constitutional plan within 30 days of the General Assembly's failure.

Relief granted.

O'CONNOR, C.J., and DONNELLY and STEWART, JJ., concur.

BRUNNER, J., concurs, with an opinion.

KENNEDY and DEWINE, JJ., dissent, with an opinion.

FISCHER, J., dissents, with an opinion.

_____

**BRUNNER, J., concurring.**

{¶ 66} I fully concur in the majority opinion. I write separately to respond to the first dissenting opinion, which takes the position that the congressional-district plan passed by the Ohio Redistricting Commission on March 2, 2022 ("March 2 plan"), is lawful because it "reasonably attempts to maximize competitive seats," dissenting opinion of Kennedy and DeWine, JJ., ¶ 91. That position is not supported by the record. And endorsing respondents' abuse of the legislative privilege is unjustifiable.

{¶ 67} In *Rucho v. Common Cause*, ___ U.S. ___, 139 S.Ct. 2484, 2500, 204 L.Ed.2d 931 (2019), the United States Supreme Court stated that creating a "fair" redistricting plan is difficult because the word "fair" may mean different things to different people. The interpretation of the word "fair" depends on the goal of the drafters—i.e., whether their goal is to prioritize the creation of competitive districts, to create proportionality, or to adhere to "traditional" redistricting criteria. *Id*. However, those goals sometimes conflict. For example, "making as many districts as possible more competitive" could lead to a high degree of disproportionality. *Id.* In reaching the conclusion that the March 2 map was designed to prioritize competitive districts and is therefore constitutional, the first dissenting opinion falls short, not determining whether the underlying record supports that conclusion.

{¶ 68} Maximizing competitive districts was the publicly stated goal behind the plan passed by the General Assembly and signed by the governor in November 2021 ("the first plan"). *See Adams v. DeWine*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, ¶ 17-19, 22. But the first plan was not created in the public eye. Respondents[9] created it entirely in private.

{¶ 69} During discovery in *Adams*, the petitioners requested evidence concerning the creation of the first plan—including, for example, evidence substantiating who was drafting the plan, what instructions were given to the map drawers, and how the respondents were analyzing a district's competitiveness. But respondent President of the Senate Matt Huffman and respondent Speaker of the House Robert Cupp broadly invoked legislative privilege to avoid responding to any inquiry regarding legislators' statements and decisions during the creation of the plan. The petitioners in *Adams* objected to the respondents' invocation of legislative privilege at depositions and in their merit briefs. Unfortunately, the highly expedited nature of that case prevented the issue of legislative privilege from being fully litigated.

{¶ 70} Senate President Huffman and House Speaker Cupp later sought to rely on assertions about some of the very same subjects over which they had invoked legislative privilege. For example, as support for the claim that the first plan prioritized competitive districts, Senate President Huffman and House Speaker Cupp

---

9. In the complaints in Supreme Court case Nos. 2022-0298 and 2022-0303, petitioners named four respondents: Secretary LaRose in his official capacity as secretary of state, House Speaker Cupp in his official capacity as House speaker, Senate President Huffman in his official capacity as Senate president, and the commission. Senator McColley and Representative LaRe were not named as parties in the original complaints. They filed a motion for leave to file an amended notice of their substitution, notifying the court that they had been appointed to the commission to replace Senate President Huffman and House Speaker Cupp, who are no longer members of the commission. To the extent the commission is a party, Senator McColley and Representative LaRe asked to be substituted for their predecessors on the commission. This court granted Senator McColley and Representative LaRe's motion. 166 Ohio St.3d 1523, 2022-Ohio-1887, 188 N.E.3d 179. Senate President Huffman, House Speaker Cupp, Senator McColley, and Representative LaRe filed a joint merit brief in this matter.

asserted in their merit brief in *Adams* that Ray DiRossi, an employee of the Senate Republican caucus and a drawer of that first plan, "testified that he was instructed to create maps in compliance with Article XIX [of the Ohio Constitution], and which included more competitive districts than Ohio's current congressional plan." But the portion of DiRossi's deposition they cited for this point is disingenuously circular, lacking any substance to support their contention: DiRossi testified that he was aware that "President Huffman *made public commentary about* the importance of having competitive districts." (Emphasis added.) That is not evidence of what instructions legislators gave to DiRossi as the first plan was created.

{¶ 71} The respondents in *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, pointed to nothing else in the record to support the assertion that DiRossi had been instructed to create competitive districts or to convincingly establish that maximizing competitiveness had been the overall goal of legislators when the first plan was created. In finding that the plan violated Article XIX, Sections 1(C)(3)(a) and (b) of the Ohio Constitution, we reviewed the record and concluded that the respondents' competitiveness rationale was a "post hoc rationalization." *Adams* at ¶ 45.

{¶ 72} The dissenting opinion in *Adams* accepted the respondents' unsupported assertion that the plan had been designed to create competitive districts and would have approved the plan on the ground that the competitiveness rationale was reasonable. *Id.* at ¶ 167-186 (Kennedy, Fischer, and DeWine, JJ., dissenting). In doing so, however, it pointed to nothing in the record concerning the actual creation of the first plan. *Id.* at ¶ 167-170 (Kennedy, Fischer, and DeWine, JJ., dissenting). The law, as expressed by the dissent in *Adams*, is not supported by the record. No underlying evidence supports the premise that the respondents had designed the first plan to maximize competitive districts.

{¶ 73} In drawing the March 2 plan, respondents made minimal changes from the first plan. When petitioners sought discovery into the behind-closed-doors

work on the March 2 plan, respondents again invoked legislative privilege. The record therefore provides no more support for the idea that the March 2 plan was designed to maximize the number of competitive districts than it did for the first plan.

{¶ 74} Notwithstanding this, the first dissenting opinion reasserts what was stated in the dissenting opinion in *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __. It asserts that the March 2 plan "reasonably attempts to maximize competitive seats," dissenting opinion of Kennedy and DeWine, JJ., at ¶ 91, but it again points to nothing in the record supporting that assertion. The dearth of evidence in the record to support respondents' arguments is due to respondents' own decision to invoke legislative privilege. Bare reliance by the dissent on the statements in respondents' briefs is insufficient to constitute law.

{¶ 75} There is yet another fundamental problem with the first dissenting opinion. It is well established in Ohio that a litigant may not abuse a privilege by using it as both a sword and a shield. It is patently unfair to invoke a privilege during discovery and then waive it selectively to gain an evidentiary foothold to the detriment of the party seeking the discovery. *See Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 2010-Ohio-4469, 937 N.E.2d 533, ¶ 41; *State v. Houck*, 2d Dist. Montgomery No. 09-CA-08, 2010-Ohio-743, ¶ 38; *see also In re Lott*, 424 F.3d 446, 454 (6th Cir.2005), quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991) ("To be sure, litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. '[T]he attorney-client privilege cannot at once be used as a shield and a sword' " [brackets added in *Lott*]).

{¶ 76} Courts in other jurisdictions have rejected attempts by legislators to use the legislative privilege as both a sword and a shield in redistricting litigation. *See Favors v. Cuomo*, 285 F.R.D. 187, 212 (E.D.N.Y.2012) ("once the [legislative] privilege is invoked, the Court should not later allow the proponent of the privilege to strategically waive it to the prejudice of other parties"); *Commt. for a Fair &*

*Balanced Map v. Illinois State Bd. of Elections*, N.D.Ill. No. 11 C 5065, 2011 WL 4837508, at *11 (Oct. 12, 2011); *Singleton v. Merrill*, N.D.Ala. Nos. 2:21-cv-1291, 2021 WL 5979516, at *8 (Dec. 16, 2021) (rejecting legislators' defense of redistricting plan because it "depend[ed] on their assertions about their intent and motives during the legislative process, [and] they [invoked the legislative privilege to] refuse to participate in any discovery that would allow the * * * plaintiffs to challenge those assertions").

{¶ 77} This issue has not been raised until now. The first dissenting opinion does not have a discussion of either the scope of the legislative privilege or the way it may be used. Allowing respondents to invoke the legislative privilege to prohibit discovery into officials' goals in the creation of the first plan and the March 2 plan, and then allowing respondents to rely on bare assertions about those subjects in defense of those plans, is an invitation to parties to avail themselves of this abuse of power in the future. This court should ensure that discovery is available in cases like this so that the court can meaningfully judge whether a party's arguments about what they designed a plan to do can be tested by evidence in the record or are instead simply post hoc rationalization. This court should not accept a party's abuse of legislative privilege, particularly when that party uses it to create a contrived evidentiary basis in support of a legal argument. To look the other way—as the dissent did in *Adams*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, and as the first dissenting opinion does again here, creates the risk that Ohio's constitutional requirements for drawing congressional districts can be effectively avoided and thereby defeated by an abuse of legislative privilege.

{¶ 78} For these reasons, I offer this concurring opinion while also joining the majority opinion.

—————————————

31

**KENNEDY and DEWINE, JJ., dissenting.**

**{¶ 79}** These cases are about an election that will not be held until 2024. The new complaints filed in this court protest the congressional-district plan adopted by the Ohio Redistricting Commission on March 2, 2022 ("the March 2 plan") in response to the majority's decision in *Adams v. DeWine*, ___ Ohio St.3d ___, 2022-Ohio-89, ___ N.E.3d ___, which invalidated the plan that had been passed by the General Assembly in November 2021 ("the first plan").

**{¶ 80}** In *Adams*, the majority held that the first plan violated Article XIX, Section 1(C)(3)(b) of the Ohio Constitution because that plan unduly split governmental units—specifically, Hamilton, Cuyahoga, and Summit Counties. *Id*. at ¶ 5. In these cases, the majority admits that the March 2 plan does not excessively split any county. Majority opinion, ¶ 64. We agree. We disagree, however, with the majority's conclusion that the March 2 plan is invalid because it violates Article XIX, Section 1(C)(3)(a) of the Ohio constitution for " 'unduly favor[ing] or disfavor[ing] a political party or its incumbents.' " Majority opinion at ¶ 28, quoting Article XIX, Section 1(C)(3) of the Ohio Constitution. Therefore, we would hold that the March 2 plan is constitutional and order its use for the 2024 primary and general elections. Because the majority does otherwise, we dissent.

**{¶ 81}** While the March 2 plan is new, there is little that could be considered "new information" in the majority opinion. The majority applies the same faulty analysis that it used in *Adams* and therefore fails to present "any workable standard about what it means to unduly favor a political party." *Adams* at ¶ 107 (Kennedy, Fischer, and DeWine, JJ., dissenting). The majority clings to proportionality, which appears in Article XI of the Ohio Constitution but not in Article XIX, the relevant provision in this case. Nevertheless, as the dissenting opinion in *Adams* explains, the majority believes that the partisan breakdown should "roughly equate to what would happen under a system of proportional representation." *Id.* at ¶ 108. By making policy rather than applying the law, *id*. at ¶ 110, the majority "wrest[s]

from the political branches of our government the authority that rightly belongs to them," *id*. at ¶ 111.

## I. BACKGROUND

{¶ 82} Despite the far-off relevance of another redistricting plan, the majority rushed these cases to completion. The majority's scheduling order for these cases sacrificed a robust discovery process in exchange for a speedy result. As we wrote in our opinion concurring in part and dissenting in part as to the scheduling order, "[t]his case most likely will turn on the credibility of expert testimony," and "25 days is insufficient" time for discovery, given the need to schedule depositions for numerous fact and expert witnesses. 166 Ohio St.3d 1452, 2022-Ohio-1016, 184 N.E.3d 138, ¶ 5 (Kennedy, Fischer, and DeWine, JJ., concurring in part and dissenting in part). Each side filed its evidence on April 25, leaving no time to depose the other's experts, and we are left with a discovery process that has produced a large amount of information but little critical analysis. In our opinion, we advocated for a 25-day period after expert reports were exchanged so that each side could conduct further discovery. *Id.* at ¶ 28. And as we predicted, the 25-day discovery time left no time to depose experts or to challenge the bases on which those experts made their decisions. While it is easy to see what has been lost due to the truncated discovery period, it is far more difficult to see what has been gained. The 2022 election cycle is set. Consequently, there was no need to cut discovery short and hurry these cases along. This truncated discovery period enables the majority to cherry-pick its preferred expert evidence, without the adverse parties being able to test the reliability of that evidence through cross-examination. None of the normal procedural safeguards that facilitate truth finding are present in these cases, despite the majority outsourcing its entire analysis to expert testimony that exists in a vacuum.

{¶ 83} The majority holds that the March 2 plan is "slightly less favorable to the Republican Party (or more favorable to the Democratic Party) than the [first]

plan." Majority opinion at ¶ 35. The majority guesstimated in *Adams*, ___Ohio St.3d ___, 2022-Ohio-89, ___ N.E.3d ___, at ¶ 47, that Republicans would win 12 of Ohio's 15 Congressional seats under the first plan. Under the March 2 plan, the majority concludes that there are five Democratic-leaning districts and ten Republican-leaning districts. Majority opinion at ¶ 16. Because we would have held that the first plan did not unduly favor Republicans and was constitutional, we conclude that the March 2 plan, which the majority admits is less favorable to Republicans than the March 2 plan, is also constitutional.

## II. ANALYSIS

### A. Does the commission's plan have to comply with Article XIX, Section 1(C)?

{¶ 84} Respondents argue that these cases are easily resolved because a plan adopted by the commission need not comply with any of the requirements of Article XIX, Section 1(C)(3) of the Ohio Constitution. They argue that the admonitions in Article XIX, Section 1(C) apply only to plans passed by the General Assembly. For example, Section 1(C)(3)(a) states that the "*general assembly* shall not pass a plan that unduly favors or disfavors a political party or its incumbents." (Emphasis added.)

{¶ 85} Although respondents raise a serious argument, we are mindful of the " 'cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more.' " *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 51, quoting *PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 362 F.3d 786, 799 (C.A.D.C.2004) (Roberts, J., concurring in part and in judgment). Indeed, this dissenting opinion will not address this issue because, whether it was required to or not, the March 2 plan satisfies the requirements of Article XIX, Section 1(C)(3)(a) and (b) of the Ohio Constitution. So, it is unnecessary to decide more.

### B. The March 2 plan complies with Section 1(C)(3)(b)

{¶ 86} As we explained in *Adams*, the first plan complied with Article XIX, Section 1(C)(3)(b). *Adams*, ___Ohio St.3d ___, 2022-Ohio-89, ___ N.E.3d ___, at ¶ 216 (Kennedy, Fischer, and DeWine, JJ., dissenting). Accordingly, we agree with the majority today that the March 2 plan also complies with Section 1(C)(3)(b). There was no undue splitting of counties in the first plan, and there is no undue splitting of counties in the March 2 plan.

### C. The March 2 plan complies with Section 1(C)(3)(a)

{¶ 87} We continue to disagree with the majority's approach to determining whether a redistricting plan "unduly favors" one political party. It is true that Article XIX leaves undefined what it means to "unduly favor" a party. In *Adams* at ¶ 40, the majority held that the requirement in Article XIX, Section 1(C)(3)(a) that a plan not unduly favor or disfavor a political party or its incumbents does not prohibit a plan from favoring one party but that it does prohibit "favoritism not warranted by legitimate, neutral criteria." But in *Adams*, the majority chose one type of criteria—proportional representation, which does not exist in Article XIX— as the baseline against which partisan favoritism is measured. That is, the majority requires that the share of winning districts for each party should match the proportion of the popular vote for each party in a particular group of previous elections.

{¶ 88} The problem with the majority opinion's analysis that there is no such requirement in Article XIX. In Article XI, which applies to General Assembly redistricting, proportionality is something the commission is instructed to attempt, and Article XI, Section 6 of the Ohio Constitution provides the formula for the commission to apply. But there is nothing in Article XIX that establishes proportionality as an aspirational goal, much less a requirement. "The majority simply substitutes its own sense of fairness for the text of Article XIX." *Adams* at ¶ 144 (Kennedy, Fischer, and DeWine, JJ., dissenting). In substituting our own

sense of fairness for that of the governmental body that is constitutionally assigned the duty to create the redistricting plan, the majority goes beyond the judicial power granted to this court in Article 4 of the Ohio Constitution. *Id*. at ¶ 150.

{¶ 89} When passing a congressional-district plan as part of a simple majority vote, the General Assembly must prepare "an explanation of the plan's compliance with" Article XIX, Section 1(C)(3)(a) through (c). Ohio Constitution, Article XIX, Section 1(C)(3)(d). As for the first plan, the General Assembly wrote, "The plan contain[ed] six Republican-leaning districts, two Democratic-leaning districts, and seven competitive districts"; only one district paired incumbents, and they were members of the Republican party; "[t]he plan split[] only twelve counties and only fourteen townships and municipal corporations"; and "visual inspection of the congressional district plan demonstrate[d] that it dr[ew] districts that [were] compact." 2021 Sub.S.B. No. 258, Section 3, 733-734, available at https://search-prod.lis.state.oh.us/solarapi/v1/general_assembly_134/bills/sb258/EN/05/sb258_05_EN?format=pdf (accessed July 8, 2022) [https://perma.cc/DF75-WC9K].

{¶ 90} There is nothing in the Constitution that precludes map makers from seeking to maximize competitive districts, and such a goal does not cause undue favoritism. And, as we opinion stated in *Adams*, ___Ohio St.3d ___, 2022-Ohio-89, ___ N.E.3d ___, the range of plus or minus 4 percent of 50 percent is within the bounds of the map drawers' constitutional mandate. *Id*. at ¶ 178 (Kennedy, Fischer, and DeWine, JJ., dissenting). We further explained: "The General Assembly, this state's policymaking body, chose that range. We have no authority or competence to monitor the dividing line between competitive and not." *Id.* at ¶ 177.

{¶ 91} The March 2 plan is again oriented toward competitiveness. As explained by Sean P. Trende, a senior elections analyst for RealClearPolitics who tracks, analyzes, and writes about elections, the plan features two noncompetitive districts favoring Democrats (Districts 3 and 11) and six noncompetitive districts favoring Republicans (Districts 2, 4, 5, 6, 8, and 12). The other districts are

competitive in the same way we decided was acceptable in regard to the first plan—within 4 percentage points of 50 percent. There are seven such districts in the new plan: District 1 (50.7 percent Democrat), District 7 (54 percent Republican), District 9 (52.8 percent Democrat), District 10 (52.2 percent Republican), District 13 (53 percent Democrat), District 14 (53 percent Republican), and District 15 (53.9 percent Republican). The March 2 plan meets the standard that we found to be acceptable in *Adams*—i.e., it reasonably attempts to maximize competitive seats.

**{¶ 92}** The commission's choice to focus on creating competitive districts where they are possible is consistent with Article XIX, Section 1(C)(3)(a) and its requirement that districts do not unduly favor a political party or its incumbents. "Competitive districts are widely considered a laudable objective, the sort of objective voters desire; they do not unduly favor or disfavor political parties but allow the electorate to elect." *id.* at ¶ 163 (Kennedy, Fischer, and DeWine, JJ., dissenting). The majority, on the other hand, prioritizes guaranteed outcomes over competitive elections. There is no constitutional basis for such a choice.

**{¶ 93}** Given the political geography of Ohio, when the neutral map-drawing rules of Article XIX, Section 2 are followed, certain results are likely. The map-drawing rules in Section 2 are based on representation by geographical area; those rules are not designed to create districts of the likeminded. We have the same representatives as our neighbors but not necessarily the same representatives as those who think like us. The adoption of Article XIX did not make Ohio the only state in the union to guarantee a proportion of congressional seats for each party based on historical vote totals from past political races.

**{¶ 94}** This court is not an equal partner with the General Assembly and the commission when it comes to redistricting. A plan passed by the General Assembly or adopted by the commission does not automatically come to this court for our blessing. Our role is limited and is triggered only when someone protests a plan. We are not involved in the policy determination of the best way to achieve the

requirements of Article XIX, Section 1(C)(3)(a). We are limited to exercising judicial power, which is "the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." *Muskrat v. United States*, 219 U.S. 346, 361, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

**{¶ 95}** It is not for us to decide how we would draw a congressional-district map. Instead, "our precedent in redistricting cases applies a strong presumption that a plan is constitutional." *Adams*, ___Ohio St.3d ___, 2022-Ohio-89, ___ N.E.3d ___, at ¶ 150 (Kennedy, Fischer, and DeWine, JJ., dissenting), citing *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 22, *superseded by constitutional amendment as stated in League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St. 3d ___, 2022-Ohio-65, ___ N.E.3d ___.

**{¶ 96}** But the outcome of these cases today demonstrates that the majority has once again assumed an oversized role in the process of drawing a congressional-district map by perpetuating its own standard of what constitutes "unduly favoring" a political party. The majority faults the commission for not following that standard. But in reality, there is only one standard that matters. The majority clearly has a number of Democrat congressional seats in mind, and any plan that does not result in that number will be deemed unconstitutional and therefore invalid.

### III. CONCLUSION

**{¶ 97}** We agree with the majority that the March 2 plan meets the requirements of Article XIX, Section 1(C)(3)(b) of the Ohio Constitution. But we dissent because the majority continues to require proportional representation, which does not exist as a requirement anywhere in Article XIX. We would hold that the March 2 plan complies with Article XIX, Section 1(C)(3)(a) of the Ohio Constitution and that that plan should apply to the 2024 primary and general elections.

---

**FISCHER, J., dissenting.**

{¶ 98} I fully join the other dissenting opinion.  I write to expound on a few points of particular importance.

## I.  Petitioners have not proven their cases beyond a reasonable doubt

{¶ 99} As noted in the majority opinion, the challenges of the petitioners in these cases are "subject to the highest standard of proof: proof beyond a reasonable doubt."  Majority opinion, ¶ 27.

{¶ 100} But petitioners do not even meet the lower clear-and-convincing-evidence burden of proof or the even lower preponderance-of-the-evidence burden of proof.  In any event, petitioners have not satisfied their burden of showing beyond a reasonable doubt that the March 2 plan unduly favors the Republican Party in violation of Article XIX, Section 1(C)(3)(a) of the Ohio Constitution.

{¶ 101} In Section II(A) of their merit brief, respondents Senate President Huffman, Senator Rob McColley, Representative Jeff LaRe, and Speaker of the House Robert Cupp set forth a detailed argument pointing out numerous flaws in the evidence that is relied on in the majority opinion.  In the interest of brevity, I will not reprint that argument here; however, respondents have both identified numerous flaws in the experts' reports relied on in the majority opinion and raised significant doubts as to whether petitioners have presented a full mathematical analysis.  These flaws and incomplete analyses directly attack the majority opinion.  The majority opinion not only sidesteps respondents' points but also faults respondents for failing to depose petitioners' experts within the limited time that this court provided for discovery.  Majority opinion at ¶ 60.

{¶ 102} In doing so, the majority opinion turns the burden of proof on its head.  Respondents have *no* burden of production in these cases.  Instead, it is incumbent upon petitioners to prove their cases beyond a reasonable doubt. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-

Ohio-65, ___ N.E.3d ___¶ 78-79, citing *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 20-21; *see also Adams v. DeWine*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, ¶ 26. Respondents have raised more than reasonable doubts, regardless of whether petitioners' experts could have or should have been deposed. Indeed, those and other reasonable doubts are further explored in the other dissenting opinion. In concluding otherwise, the majority opinion seems to ultimately apply some lesser burden of proof, even though it purports to apply the beyond-a-reasonable-doubt burden of proof. Because petitioners have not satisfied their burden of proof, I must respectfully dissent from the majority opinion.

### II. The procedure used in these cases is fundamentally flawed

{¶ 103} In addition, I have deep concerns regarding the process used by this court to decide these cases. These cases arose under our exclusive, original jurisdiction pursuant to Article XIX, Section 3(A) of the Ohio Constitution. Despite the fact that we are the "trial court" in these cases, this court has subjected these cases to an unnecessarily compressed schedule. This compressed schedule negatively impacted our decision-making process in two ways. First, the timeline limited the type and quality of evidence that this court could consider in making its decision. By forgoing the standard discovery process, this court was forced to (1) consider only the unexamined assertions of the parties' experts and (2) rely on stipulated evidence. The lack of adversarial hearings here has prevented this court from hearing direct testimony and cross-examination. This complete absence of adversarial proceedings has deprived this court and the citizens of Ohio of the legal crucible that provides everyone—including members of the bench, the bar, and the public—with the best view of the evidence. There is an old saying: "bad facts make bad law." That saying might be slightly altered here: "a bad understanding of a case makes a bad decision."

{¶ 104} Second, the compressed timeframe has resulted in a lack of transparency, which is particularly concerning given the high-profile nature of these cases and the fact that they seem to be of great interest to all Ohioans. It would have been very easy for this court to schedule some public hearings at which the parties could have presented their cases, including direct testimony and cross-examination, and this court could have received a full picture of the evidence. These hearings could have been broadcast for all Ohioans to see, just as all our oral-argument sessions are. There is absolutely no reason for this court's failure to hold such public hearings.

{¶ 105} This court's failure to hold even one hearing in these cases undoubtedly raises concerns among the public regarding this court's lack of transparency, and one might wonder why such concerns have not been voiced in the media. Regardless, if this court is to strike a constitutionally enacted and mandated congressional plan, it should do so in the light of day, providing Ohioans with a meaningful opportunity to understand not just all the evidence before this court but also this court's decision-making process in such an important matter.

### III. Conclusion

{¶ 106} This court's misguided rush to decide these cases has resulted in an unnecessary and truncated procedure that has effectively tied this court's hands and rendered it unable to make a fully informed decision. Given the evidence before this court, petitioners have failed to satisfy their burden of showing beyond a reasonable doubt that the March 2 plan unduly favors the Republican Party in violation of Article XIX, Section 1(C)(3)(a) of the Ohio Constitution.

{¶ 107} Accordingly, I respectfully dissent.

———————————

McTigue Colombo & Clinger, L.L.C., Donald J. McTigue, and Derek S. Clinger; and Elias Law Group, L.L.P., Abha Khanna, Ben Stafford, Jyoti Jasrasaria,

Spencer W. Klein, Harleen K. Gambhir, and Raisa Cramer, for petitioners in case No. 2022-0298.

ACLU of Ohio Foundation, Inc., Freda J. Levenson, and David J. Carey; American Civil Liberties Union Foundation, Alora Thomas, and Julie A. Ebenstein; and Covington & Burling, L.L.P., Robert D. Fram, Donald Brown, David Denuyl, Janelle Lamb, James Smith, Sarah Suwanda, Alex Thomson, Kimberly Plumer, Rishi Gupta, Alexandra Widas, Anupam Sharma, and Yale Fu, for petitioners in case No. 2022-0303.

Dave Yost, Attorney General, and Julie M. Pfeiffer, Jonathan D. Blanton, Michael A. Walton, and Allison D. Daniel, Assistant Attorneys General, for respondent Ohio Secretary of State Frank LaRose.

Nelson Mullins Riley & Scarborough, L.L.P., Phillip J. Strach, Thomas A. Farr, John E. Branch III, and Alyssa M. Riggins; and Taft Stettinius & Hollister, L.L.P., W. Stuart Dornette, Beth A. Bryan, and Philip D. Williamson, for respondents Senate President Matt Huffman, Speaker of the House Robert Cupp, Senator Robert McColley, and Representative Jeffrey LaRe.

Dave Yost, Attorney General; and Organ Law, L.L.P., Erik J. Clark, and Ashley T. Merino, special counsel to Attorney General Dave Yost, for respondent Ohio Redistricting Commission.

Chris Tavenor; and Hubay Dougherty, L.L.C., and Trent Dougherty, urging granting of relief for amici curiae, Ohio Environmental Council, Ohio Organizing Collaborative, Ohio Farmers Union, LEAD Ohio, Red Wine & Blue, OPAWL– Building AAPI Feminist Leadership, Innovation Ohio, Ohio Coalition on Black Civic Participation/Ohio Unity Coalition, and Ohio Citizen Action.

————————————